Richard M. BARLOW, Plaintiff,

v.

The UNITED STATES, Defendant.

Cong. Ref. No. 98–887X.

United States Court of Federal Claims.

Originally Filed: Dec. 21, 2001.

Reissued: Jan. 14, 2002 *.

* Publication was deferred pending the parties' review for redaction of controlled materials. Those redactions are indicated by brackets.

General, and David M. Cohen, Director, Civil Division, Department of Justice, Washington, D.C., for defendant. Stewart F. Aly, Department of Defense, of counsel.

## OPINION

BRUGGINK, Judge.

This congressional reference arises from a private bill to consider the amount, if any, of relief legally or equitably due from the United States to plaintiff, Richard Barlow, for losses incurred by Mr. Barlow relating to "(1) personnel actions taken by the Department of Defense ["DoD"] affecting Mr. Barlow's employment at the Department (including Mr. Barlow's top secret security clearance) during the period of August 4, 1989 through February 27, 1992; and (2) Mr. Barlow's separation from service with the [DoD] on February 27, 1992." S. 2274, 105th Cong. § 1 (1998); S. Res. 256, 105th Cong. (1998). Plaintiff bases his entitlement to compensation on the Whistleblower Protection Act ("WPA"), 5 U.S.C §§ 2302 et seq. (1994), and the common law theories of wrongful termination, intentional infliction of emotional distress, and blacklisting.

Pending are the defendant's motion to strike and the parties' cross-motions for summary judgment. Oral argument was held on September 18, 2001. The court requested additional briefing to address which laws were implicated by plaintiff's WPA claim and defendant's defense to that claim. For the reasons set out below, defendant's motion to strike is denied; plaintiff's motion for summary judgment is denied; and defendant's motion for summary judgment is granted in part and denied in part.

## BACKGROUND [1]

Mr. Barlow began his career with the United States government as a professional level intern at the Arms Control and Disarmament Agency ("ACDA") where he worked from June 1980 until May 1982. The mission of the ACDA was to advise the President, the Secretary of State, and the National Security

Joseph A. Ostoyich, Howrey Simon Arnold & White, LLP, Washington, D.C., for plaintiff.

Robert E. Kirschman, Jr., with whom were Stuart E. Schiffer, Acting Assistant Attorney

1. The facts are drawn from the parties' proposed findings of fact and appendices. Most of the background facts are undisputed. To the extent the parties disagree, those disputes are noted.

Council with respect to arms control, nuclear non-proliferation, and disarmament matters, and to verify compliance with existing arms control agreements and commitments. With respect to Pakistan, ACDA was responsible for providing a recommendation to the President on whether to certify Pakistan under the 1985 Pressler Amendment to the Foreign Assistance Act. The Amendment provided new restrictions on U.S. aid to Pakistan:

> No assistance shall be furnished to Pakistan and no military equipment or technology shall be sold or transferred to Pakistan, pursuant to the authorities contained in this chapter or any other Act, unless the President shall have certified in writing to the Speaker of the House of Representatives and the chairman of the Committee on Foreign Relations of the Senate, during the fiscal year in which assistance is to be furnished or military equipment or technology is to be sold or transferred, that Pakistan does not possess a nuclear explosive device and that the proposed United States assistance program will reduce significantly the risk that Pakistan will possess a nuclear explosive device.

22 U.S.C. § 2375(e) (1994).

In addition to the Pressler Amendment, in 1985 Congress also passed the Solarz Amendment. Unlike the Pressler Amendment, the Solarz Amendment was not specific to Pakistan, but rather prohibited economic or military assistance to any non-nuclear weapon states that exported or attempted to export from the U.S. "any material, equipment, or technology which would contribute significantly to the ability of such country to manufacture a nuclear explosive device if the President determines that the material, equipment, or technology was to be used by such country in the manufacture of a nuclear explosive device." [2] 22 U.S.C. § 2429a (repealed).

According to Mr. Barlow's present assertions, while he was employed by the United States there was a "broad effort to conceal information from Congress and to maintain the Reagan and [the first] Bush administrations' proposed aid packages and proposed

military sales to Pakistan in contravention of the Pressler and Solarz Amendments." Pl.'s Mot. at 7–8. Mr. Barlow maintains that many of the events that occurred during the Reagan and first Bush administrations are circumstantial evidence of this effort, and that Mr. Barlow's alleged disclosures throughout his employment were attempts by him to uncover this effort.

After his work at the ACDA, in July of 1985, Mr. Barlow accepted a position as a proliferation intelligence officer with the Central Intelligence Agency ("CIA") in the Office of Scientific and Weapons Research [_____.] Mr. Barlow received commendations from the CIA, the State Department, and the Commerce Department for his work [_____] Mr. Barlow believed that State Department officials told [_____] in an effort to maintain good relations between the Reagan administration and the Pakistani government. In 1990, Mr. Barlow informed the Defense Criminal Investigative Service that an obstruction of justice may have occurred. Mr. Barlow's concerns were subsequently the subject of a 1991 investigation by the State Department Inspector General.

While at the CIA, Mr. Barlow was also concerned about the accuracy of testimony given by the intelligence community's senior non-proliferation officer, Retired General David W. Einsel. Mr. Barlow accompanied Gen. Einsel to a top-secret congressional briefing on July 22, 1987. Mr. Barlow believed that one of the statements Gen. Einsel made to the committee—that [_____] was only investigating two cases involving Pakistan's nuclear procurement—was inaccurate. Based on his belief, Mr. Barlow disagreed with and interrupted Einsel's testimony during the congressional briefing to correct the statement. After the hearing, Gen. Einsel sought to have Mr. Barlow removed from his position. Mr. Charles Burke, Mr. Barlow's supervisor, intervened, however, and Mr. Barlow's allegations with respect to Gen. Einsel's testimony were later the subject of a CIA Inspector General investigation. In

---

**2.** Although the Solarz Amendment was repealed in 1994, *see* Pub.L. 103–236, 108 Stat. 519 (1994), a substantively similar certification is still required pursuant to 22 U.S.C. § 6301.

September 1988, Mr. Barlow resigned from the CIA.[3]

On December 17, 1987, President Reagan certified, pursuant to the Pressler Amendment, "that Pakistan does not possess a nuclear explosive device and that the proposed United States assistance program will reduce significantly the risk that Pakistan will possess a nuclear explosive device." President Reagan also certified United States assistance to Pakistan in 1988, despite the ACDA's formal recommendation against the Pressler certification.

After leaving the CIA, Mr. Barlow entered training to become a criminal investigator at the U.S. Customs Academy. While in training, Mr. Barlow contacted Mr. Gerald Brubaker, a senior intelligence officer at the DoD's Office of Non–Proliferation Policy, to inquire about a position in that office. Mr. Brubaker, who was familiar with Mr. Barlow's work at the CIA, thought Mr. Barlow would be a good candidate and suggested he be hired. Thus, after graduation from the Customs Academy, instead of beginning work as a criminal investigator, Mr. Barlow accepted a probationary position as an intelligence officer in the Office of Non–Proliferation Policy in January 1989.

In the Spring of 1989, shortly after beginning his new position, Mr. Barlow prepared an extensive analysis of Pakistan's nuclear program for Secretary of Defense Richard Cheney. This was done in preparation for an upcoming visit to the United States by Pakistan's Prime Minister. The paper discussed Pakistan's ability to deliver nuclear weapons using F–16s that the U.S. had earlier sold to Pakistan. Mr. Barlow concluded in the paper that Pakistan intended to use the F–16 as a nuclear delivery platform. Mr. Michael MacMurray, the DoD country director for Pakistan, worked with Mr. Barlow on the paper. In his deposition in this case, Mr. MacMurray stated that he was concerned at the time that the proposed F–16 sale to Pakistan not be jeopardized. Mr. Barlow's memorandum for the Secretary of

Defense was subsequently rewritten. Secretary of Defense Cheney received the re-written report, and the F–16 sale was formally proposed to Congress on July 11, 1989.

On April 17, 1989, Mr. Barlow's immediate supervisor, Mr. Gerald Oplinger, the Director of the Office of Non–Proliferation Policy, gave Mr. Barlow his performance evaluation. Mr. Oplinger stated that Mr. Barlow's performance to date "exceeds fully successful." The evaluation went on to state, in pertinent part:

1. Mr. Barlow has demonstrated an excellent understanding of U.S. nuclear export policy and procedures. He is particularly sensitive to protecting DoD's interests in fulfilling the [Secretary of Defense's] statutory responsibilities.

2. Mr. Barlow has a thorough knowledge of U.S. and foreign nuclear programs and policies, of current non-proliferation policy issues, and of U.S. interagency procedures. He is highly articulate and an effective advocate of DoD positions. His knowledge of intelligence functions has improved the Directorate's ability to produce timely and complete analyses.

. . . .

Mr. Barlow has been on board for 3 months. He has not yet had adequate opportunity to demonstrate his abilities in all aspects of the critical job elements, it is clear that he exceeds the general standards of performance at his present grade level, in some areas by a substantial margin. He has much potential, but needs more time and exposure to balance his energies across the full range of the Directorates responsibilities.

Mr. Victor Rostow, Mr. Barlow's second-line supervisor and the principal Director to the Deputy Assistant Secretary of Defense for Conventional Forces and Arms Control Policy, concurred with Mr. Oplinger's recommendation, stating "Mr. Barlow is a bright, aggressive, and intelligent action officer."

---

3. Defendant does not dispute the facts as stated with respect to the Gen. Einsel's testimony, Defendant's *Statement of Genuine Issues* ("DSGI") ¶¶ 75–82, but contends that the testimony and the

events surrounding the testimony, including Mr. Barlow's allegations, are immaterial to the disposition of this case.

Mr. Barlow was recommended for a promotion from a GS–11 to GS–12 grade level. On April 19, 1989, the promotion was approved by Mr. James E. Hinds, Mr. Barlow's third-line supervisor, the Deputy Assistant Secretary of Defense. Mr. Hinds' memorandum recommending the promotion states in pertinent part:

> [Mr. Barlow] has demonstrated a broad knowledge of non-proliferation issues, analytical skills, and the ability to carry out the duties described in his present position description with a minimum of supervision. His performance has been at the level I would expect of a GS–12, and I recommend that he be promoted to that grade.

Mr. Barlow's promotion received final approval and became effective on June 4, 1989. He remained, however, a probationary employee.

Prior to Mr. Barlow's performance evaluation and promotion, on or about April 1, 1989, Mr. Barlow's co-worker and the individual whom Mr. Barlow initially contacted to inquire about a position with the Office of Non–Proliferation Policy, Mr. Brubaker, approached Mr. Barlow's supervisor, Mr. Oplinger. He addressed concerns he had with Mr. Barlow's work performance and suggested that Mr. Barlow not receive a promotion. Mr. Brubaker also met with Mr. Rostow to share his concerns. Mr. Brubaker's hand-written notes of that meeting reflect the following: [4]

> We have problems—its not problem of youth—more serious.
>
> —doesn't complete assignments
>
> —has an agenda—enforcement
>
> —suppose[d] to do [intelligence] support
>
> —doesn't read Cables
>
> —doesn't read [_____]
>
> —Hasn't done reporting cable for [International Atomic Energy Agency]
>
> —Argumentative—debates endlessly—hostile.

—May have made a mistake

> —Transfer? Inside—Outside? M.T.
>
> —Problem with [National Security Agency] too earlier
>
> —Another Speier

—don't promote now—need incentive to straighten up

> —can release within 1 year
>
> —GS–11 representing [Office of Secretary of Defense]?

—Holden—Head MT?—do nuclear?

—[National Security Agency] meeting problems with Speier—AGNI [name of a long range missile] launch an example

As noted above, despite Mr. Brubaker's concerns, Mr. Barlow received a favorable evaluation and was promoted. On April 30, 1989, Mr. Oplinger retired, and on May 1, 1989, Mr. Brubaker, who was the senior person in the Office of Non–Proliferation Policy, succeeded Mr. Oplinger as Director of the Office.

On July 12, 1989, the House Foreign Affairs Subcommittee on Asian–Pacific Affairs heard testimony from John Doe,[5] a CIA employee. Plaintiff did not attend the hearing. Doe addressed, among other things, Pakistan's nuclear capabilities. Although the exact testimony and the specific questions asked are not known because the transcript of the testimony has been withheld in this case on state secrets privilege grounds,[6] it is undisputed that, during the hearing, Congressman Stephen J. Solarz, the chair of the subcommittee, requested that supplemental information be provided. The parties dispute, however, the reason for Congressman Solarz's request. Plaintiff relies on the declaration of Mr. Charles Burke, who was at the hearing. He "recall[s] that Congressman Solarz indicated that he was concerned that [John Doe's] testimony was evasive ...." The government maintains, relying on excerpts from the July 12 hearing transcript

---

**4.** Certain portions of Mr. Brubaker's notes are illegible. We have relied on defendant's undisputed representation in its Proposed Findings of Fact with respect to those portions.

**5.** The name has been changed for security considerations.

**6.** The court previously ruled that the defendant successfully invoked the state secrets privilege. We found no compelling rationale for exempting Congressional Reference proceedings. *Barlow v. United States,* No. 98–887X, 2000 WL 1141087 (Fed.Cl. July 18, 2000).

cited in a 1991 CIA Inspector General report, that although the Congressman was at one point concerned that John Doe might not have been providing complete information, the Congressman did not think John Doe was "withholding" information. Instead, relying on the deposition testimony of John Doe taken for this congressional reference, the government alleges that the committee asked for supplemental information because of "either the level of information we had at the time among the people who were there or the classification of the information . . . that the Agency could provide to the committee."

On July 13, 1989, Mr. Barlow attended a meeting of the Nuclear Export Violation Working Group ("NEVWG"), an interagency group to which he belonged. It met to address issues related to possible violations of law with respect to the export of material and equipment related to nuclear weapons. At the meeting, the members were briefed by Mr. Jonathan Schwartz of the State Department Legal Advisor's Office on what had occurred in the congressional briefing the day before. The parties disagree on the substance of Mr. Schwartz's comments about the briefing. Plaintiff cites Mr. Barlow's deposition testimony wherein he states: "[John Doe] of the CIA (my former boss) had made certain statements regarding Pakistan which Mr. Schwartz considered to be misleading and incomplete . . . ." The government, citing the testimony of Mr. Schwartz for a 1992 State Department investigation, points out that Mr. Schwartz "remembered a session where [John Doe] did brief the Committee, but does not remember anything [John Doe] said that he would consider misleading," and that Mr. Schwartz told the Inspector General that he "[did] not know of any case in which Congress was lied to or misled." App. to Df.'s Mot. for Sum. J. at 320. By the time Mr. Schwartz was deposed in this case, he did not recall this particular briefing.

After the NEVWG meeting, on July 13 or 14, Mr. Barlow approached Mr. Brubaker, who was now his supervisor, to express his concerns about what he had learned at the NEVWG meeting. This was the first contact Mr. Barlow had with Mr. Brubaker regarding John Doe's congressional testimony.

While it is undisputed that Mr. Barlow told Mr. Brubaker that he wanted to contact the CIA to find out what had happened at the committee briefing, and that Mr. Brubaker granted him permission to do so, the parties dispute specifically what Mr. Barlow told Mr. Brubaker.

Plaintiff alleges that Mr. Barlow told Mr. Brubaker that he believed John Doe's testimony was misleading and inaccurate and that John Doe had lied. Plaintiff relies on Mr. Barlow's sworn declaration and deposition testimony for this case and the statements made by Mr. Brubaker in two of the memoranda he wrote regarding Mr. Barlow's termination. Plaintiff also relies on a statement by a DoD official in the course of an investigation into Mr. Barlow's termination as well as the conclusions of two government reports finding that his statements constituted protected disclosures under the WPA.

Unfortunately, Mr. Brubaker died on April 10, 2001. He was, however, deposed. His deposition testimony of July 2000 reads:

Q: So you are not questioning what it says here that you wrote in the memorandum, that Mr. Barlow told you that he learned that Congress had been given a misleading and incomplete picture?

A: My recollection is that's exactly what he said, and that's what I wrote in the memorandum.

Q: Did you discuss with Mr. Barlow why he believed that Congress had been given a misleading and incomplete picture?

A: No.

App. to Df.'s Mot. for Sum. J. at 84.

Defendant maintains that Mr. Barlow in fact only relayed to Mr. Brubaker his belief that John Doe's testimony may have contained misleading information, that he had not formed a belief as to whether the testimony was in fact misleading and inaccurate, and that he never told Mr. Brubaker that John Doe lied to Congress. Defendant, relying on sworn statements made by Mr. Barlow during a 1993 DoD investigation and a 1989 Defense Investigative Service ("DIS") investigation, quotes Mr. Barlow to the effect that he "had absolutely no knowledge of what took place in the hearing" and "did not know

what questions were posed to the CIA by the Committee or what answers were provided, just the general subject matter." Defendant also points to Mr. Barlow's deposition in this case, in which he states that at the time he reported back to Mr. Brubaker about what Mr. Schwartz had said, his intention was merely "to call [the CIA] 'to find out what had happened.'" [7]

Pursuant to the permission granted by Mr. Brubaker, Mr. Barlow proceeded to contact two individuals at the CIA who attended the July 12th congressional briefing, Mr. Charles Burke, Mr. Barlow's second-line supervisor while he was employed at the CIA and [_____] another former colleague of Mr. Barlow's from the CIA. Mr. Barlow learned that [_____] was preparing a response to the supplemental questions raised by the committee and offered to assist in preparing the response.

Sometime after Mr. Barlow's July 12 or 13 meeting with Mr. Brubaker, on or about July 19, Mr. Barlow approached Mr. Brubaker again to discuss his concerns with respect to the July 12 briefing and to seek permission to contact two congressional staff members, Mr. Robert Hathaway and Mr. Arch Roberts, concerning John Doe's testimony. Mr. Brubaker informed Mr. Barlow that he, Mr. Barlow, was not authorized to discuss classified information with Congress. Here, again, however, the parties disagree on whether Mr. Barlow told Mr. Brubaker that John Doe's testimony was misleading, or inaccurate, or that John Doe had lied to Congress. The parties also disagree on the tone of the discourse. Barlow states in his April 19, 2000 deposition that Mr. Brubaker yelled and screamed at Mr. Barlow, warning him not to disclose classified information to Congress. Defendant counters that there is no reliable evidence to support plaintiff's version of the facts because due to Mr. Brubaker's unfortunate illness and untimely death, he was never questioned about plaintiff's later allegation that he shouted at Mr. Barlow. Defendant

also points out that the testimony of the office colleagues of Mr. Barlow and Mr. Brubaker do not support plaintiff's version of the facts.

Mr. Brubaker testified during the 1991 DoD Inspector General investigation that "at about the same time" that Mr. Barlow expressed his concerns with respect to the July 12, 1989 congressional hearing, he, Mr. Brubaker, called someone in employee relations at the DoD to discuss Mr. Barlow's termination and that Mr. Barlow's statements "may have been one of the things that precipitated it." Ms. Carol Yeary, an Employee Relations Specialist of Washington Headquarters Service, an agency with personnel functions for the Office of the Secretary of Defense, stated that the first time Mr. Brubaker contacted her regarding the procedures to terminate Mr. Barlow was shortly before a letter of termination was actually given to Mr. Barlow on August 4, 1989. In addition to contacting these officials, in late July, Mr. Brubaker engaged in extensive discussions with Mr. Rostow about his plans to terminate Mr. Barlow. In his deposition testimony in this case, Mr. Rostow stated that he did not recall that anyone considered terminating Mr. Barlow prior to July 19, 1989.

On July 25, Mr. Brubaker contacted the Defense Intelligence Agency/National Foreign Intelligence Board Office ("NFIB") document room to inquire into whether Mr. Barlow had been reading the new information that came into NFIB. This was the first time Mr. Brubaker looked into Mr. Barlow's review of NFIB documents. He was informed that Mr. Barlow had not reviewed certain information. Mr. Brubaker stated during the 1991 DoD Inspector General investigation that "the straw that broke the camel's back" was learning that Mr. Barlow had not been reading the NFIB documents. It is undisputed, however, that Mr. Barlow's job description did not contain any specific requirement for review of those documents, and in his deposition testimony in this case,

---

7. Defendant also cites a portion from Mr. Barlow's testimony during the 1991 DoD Inspector General investigation. That quotation, however, does not appear to pertain to the initial meeting between Mr. Barlow and Mr. Brubaker, but rather to the subsequent meeting between the two on

or about July 19, 1989. DSGI ¶ 74 (quoting from defendant's appendix at 236 and stating "that he 'never said that anybody was lying. I didn't know what was going on. I spoke to Mr. Burke, and all I was trying to do was help out, as he asked me to do.'").

Mr. Brubaker stated that Mr. Barlow's failure to review the documents had not affected his performance one way or the other. It is also undisputed that Mr. Barlow visited the NFIB document room at various times from April through July.

Prior to notifying Mr. Barlow of his termination, Mr. Brubaker also contacted Mr. F. Michael Maloof in the Defense Technology Security Agency ("DTSA") to inquire whether that office might be interested in hiring Mr. Barlow.[8] Mr. Bill Rudman, Mr. Maloof's boss, who was formerly at the Customs Department, rejected Mr. Maloof's suggestion that Mr. Barlow be hired because he was aware of the circumstances of Mr. Barlow's departure from Customs immediately after being trained to become an investigator.

On or about August 1, Mr. Brubaker provided Mr. Mervyn Hampton, the Assistant for Administration at the Office of the Secretary of Defense, a draft of the memorandum he planned to give to Mr. Barlow to inform him of his termination. After Mr. Hampton reviewed the memorandum, he made a notation that he "thought there was no reason not to provide Barlow [with] more details as to reason for termination. . . . Rostow said he revised draft slightly." The draft provided, in pertinent part:

> You are hereby advised that your employment will be terminated effective August 26, 1989. The action is being taken because you have failed, during your probationary period, to demonstrate your fitness for employment. Specifically, you have failed, adequately, to perform the principal duties described in your Position Description with respect to assistance to OSD action officers to provide intelligence support for the nuclear and missile nonproliferation activities of the Directorate. During your tenure, you have failed to avail yourself of relevant intelligence reporting available on these topics and to maintain current knowledge of intelligence activities of interest. Your unsatisfactory performance includes multiple instances of

failure to complete assignments, draft letters and written analyses requested of you.

On August 2, 1989, Mr. Barlow reviewed testimony prepared by Mr. MacMurray, DoD country director for Pakistan, for use by Undersecretary of Defense, Arthur Hughes. Mr. Hughes, with the aid of the prepared testimony, would address Congressional concerns about a proposed sale of F–16 fighter planes to Pakistan. The prepared testimony stated that the F–16s were not capable of delivering nuclear devices without substantial release of technical data from the United States. Implicit in the testimony was the assumption that certification would be granted under the Pressler Amendment. On August 2, 1989, Mr. Hughes testified to the committee that "past and continued support for Pakistan's conventional defenses reduces the likelihood that Pakistan will feel compelled to cross the nuclear threshold." Mr. Barlow believed this was false, and on August 2 or 3, told Mr. Brubaker, Mr. Rostow, and the individual who had prepared the testimony, Mr. MacMurray, his concerns about the truthfulness of the Hughes testimony. Mr. Barlow's concerns with respect to Undersecretary Hughes' testimony was later the subject of a DoD investigation.

On August 3, Mr. Brubaker reviewed Mr. Barlow's work on his additions to the July 12, 1989 testimony and, at the time, expressed no concern that Mr. Barlow was preparing classified information to be provided to Congressman Solarz and was not upset when Mr. Barlow went through the appropriate classified channels to correct any misstatement made by the CIA agent before the congressional committee. Mr. Barlow also delivered his comments to Canton Stoiber, the State Department chair of the NEVWG.

On August 3, 1989, the same day that Mr. Barlow provided Mr. Brubaker and Mr. Stoiber with his contribution to the supplementation, Mr. Brubaker drafted a memorandum "to provide a record of the reasons" for Mr. Barlow's termination. The memorandum was prepared after the extensive discussions that Mr. Brubaker had with Mr. Rostow in

---

8. Plaintiff disputes this finding of fact because "Mr. Brubaker called Mr. Maloof after 'a decision had been made to let Barlow go . . . .'"

Plaintiff's Statement of Genuine Issues ("PSGI") ¶¶ 57–58. Plaintiff's dispute is unresponsive.

late July. The memorandum provided, in pertinent part:

[Mr. Barlow's] sole interest is Pakistan's nuclear program, which for him appears to be a near obsession. He pursues matters related to Pakistan to the exclusion of nearly all other matters and to the detriment of his other responsibilities.

. . . .

... In several instances both then-Director Oplinger and I had to step in and complete letters to other agencies for export licenses of nuclear materials because he had stopped working on them.... He has consistently behaved irresponsibly regarding the preparation of written documents. In February 1989, we were informed by State that Mr. Barlow was more than two weeks delinquent in drafting his portion of a reporting cable on the February IAEA Board meeting, to which he was sent as a DoD representative. After several reminders, Mr. Oplinger had to order him to complete it.

There have been many additional instances of failing or refusing to document and put in writing the results of assignments made by me.

Another significant failure is his refusal to provide even a small amount of intelligence support to any of our staff .... A review of DIA records by me on July 25 indicated that Mr. Barlow has read none of the reports in any compartment, except Pakistan, and he has read none of those for nearly two months.

. . . .

Mr. Barlow has failed to comply with direct requests to support me as the DoD representative to the SNEC .... In sum, Mr. Barlow has failed entirely to acquire or maintain even a fundamental knowledge of current intelligence reporting on countries of nuclear and missile proliferation concern and to support the Directorate in any significant way.

Finally, I have major concerns about his reliability and judgement as an OSD employee regarding sensitive national security issues of great importance to DoD. On July 19, Mr. Barlow told me he intended to meet and talk to two House Foreign Affairs Committee staff members concerning an Administration briefing on the Pakistan nuclear program given the previous week. He said he had learned that CIA and State representatives had created a misleading picture of Pakistan's activities.

Mr. Brubaker marked the portion addressing the July 19, 1989 conversation with Mr. Barlow "secret." Although the July 19, 1989 conversation is referred to in the memorandum, Mr. Brubaker stated in his deposition, that when Mr. Barlow spoke to him on that date, he did not consider Mr. Barlow a security risk and thus did not contact the security division.

According to Mr. Brubaker's statements during the 1991 DoD Inspector General investigation, this was not the first time that Mr. Barlow had indicated a concern that Congress had been provided incomplete information. Mr. Barlow had made remarks to Mr. Brubaker about an incident during his time at the CIA in which he believed an agency witness had not conveyed all the information he could have to Congress.

Mr. Brubaker forwarded the August 3 termination memorandum to Mr. Hinds, Mr. Barlow's third-line supervisor and noted that Mr. Rostow concurred with his plans for terminating Mr. Barlow. Mr. Hinds wrote back to Mr. Brubaker the same day and stated: "I have nothing against Rich Barlow, but I am convinced it is not in the office's interest to let this go on."

On August 4, 1989, Mr. Brubaker prepared the final draft of the termination memorandum. He gave Mr. Barlow the memorandum the same day. In pertinent part, it stated:

The action is being taken because you have failed, during your probationary period, to demonstrate your fitness for continued employment in your present position. Specifically, you have not performed in satisfactory levels the principal duties described in your Position Description with respect to providing intelligence support to OSD action officers for the nuclear and missile non-proliferation activities of the Directorate. During your tenure, you have neglected to avail yourself of relevant intelligence reporting available on those

topics and to maintain a current knowledge of intelligence activities of interest. Your unsatisfactory performance includes multiple instances of failure to complete assignments, draft letters and written analyses specifically requested of you.

On August 4, Mr. Rostow and Mr. Brubaker informed Mr. Barlow that he was required to report to the Defense Intelligence Agency to be "read out" of his access to compartmented intelligence concerning Pakistan. On August 8, Leon Kniaz, the Director of Personnel and Security for the Washington Headquarters Service, informed Mr. Barlow that his Top Secret security clearance and access to Special Compartmented Intelligence ("SCI") were being suspended because of "*credible information concerning your ability to safeguard and protect classified information ....*" Pl.'s App. 111. The Washington Headquarters Service relied on the following information to suspend Mr. Barlow's security clearance:

- Mr. Brubaker's August 3, 1989 memorandum for the record.
- A telephone call from James Ervin of the Defense Intelligence Agency Office of Security to Stephen O'Toole, a personnel security specialist in the Security Division of the Washington Headquarters Service, informing Mr. O'Toole that Mr. Barlow had read a substantial amount of classified material at the NFIB office after learning that he was being terminated.

In his deposition, Mr. Kniaz concurred with a statement he made during the 1991 DIS investigation that "as he [understood] the circumstances, another agency had briefed congressional staffers and provided, in Mr. Brubaker's opinion of what Mr. Barlow thought, ... slanted information. And according to Mr. Brubaker, Mr. Barlow wanted to go over and give them the other side of the slant." Mr. Brubaker testified during the 1993 DoD Inspector General investigation that he did not initiate the suspension of Mr. Barlow's security clearance.

On August 11, 1989, Mr. Brubaker wrote a third memorandum for the record regarding his discussion with Mr. Barlow about the July 12, 1989 congressional briefing. This memorandum was classified "confidential." The memorandum stated in pertinent part:

On or about July 19, 1989 Mr. Barlow said that he had learned of a briefing of Congressmen and staff of the House Committee on Foreign Affairs to be presented by the CIA on Pakistan nuclear activities. He said State Department officials would also be present and that he had requested to be present also but was refused by the CIA. He said that he subsequently had talked with those State officials present and had learned that Congressman Solarz and Congressional staff had been given a misleading and incomplete picture regarding Pakistan's illicit procurement activities in the U.S. He noted in particular that his former supervisor at the CIA, [John Doe], had made misstatements.

He told me that he (Barlow) intended to talk with two staff members to "straighten them out" and identified them as Arch Roberts and Robert Hathaway.

On August 26, 1989, the date Mr. Barlow's termination was to become effective, he resigned from his position, although not from the DoD. Around this time, Mr. Barlow retained an attorney, Beth Slavet, to determine whether he could challenge the actions taken against him. Ms. Slavet had considerable experience before the Merit Systems Protection Board ("MSPB").[9] Ms. Slavet contacted an official at the Office of Special Counsel ("OSC"), the agency that hears complaints of alleged reprisals under the WPA, regarding Mr. Barlow's case. According to Mr. Barlow, the official told Ms. Slavet that neither the OSC nor the MSPB would take the case because Mr. Barlow's WPA claims were of a highly classified nature and involved the suspension of security clearances. Mr. Barlow and Ms. Slavet relied on that advice and did not file a formal complaint with the OSC.

On August 17 and September 1, 1989, Mr. Barlow requested his personnel records under the Freedom of Information and Privacy Act. He received them on October 4, 1989. One of the documents was Mr. Brubaker's

---

9. Ms. Slavet is currently Chairman of the MSPB, she was appointed in December 2000, before her appointment she had served as Vice Chair since August 1995.

August 3 memorandum in which Mr. Brubaker lists the July 19, 1989 conversation with Mr. Barlow as one of the reasons for termination. This was the first time Mr. Barlow had seen this memo.

Mr. Kniaz attempted to assist Mr. Barlow in finding a job elsewhere in the DoD and at other federal agencies. In his deposition, Mr. Kniaz states that, in his opinion, there was a lack of evidence to support Mr. Barlow's termination because, in his view, the security allegations were not substantiated. He therefore wanted to make Mr. Barlow whole by finding him a job. Mr. Kniaz also testified that his willingness to help Mr. Barlow was due in part to his, Mr. Kniaz's, concern that information regarding Mr. Barlow would be made public and would be damaging and embarrassing to the Office of the Secretary of Defense. Mr. Kniaz was not successful in obtaining Mr. Barlow an equivalent job. Prospective employers were told by Mr. Kniaz that Mr. Barlow's security clearances were suspended. Mr. Barlow claims that the employers had also heard that his performance at the DoD was inadequate. Mr. Kniaz was, however, able to secure Mr. Barlow temporary employment in various positions within the DoD through January 6, 1990. At that time, Mr. Barlow declined to accept further temporary employment because the positions to which he would be assigned were not related to his area of expertise and he went on leave without pay. On February 27, 1992, Mr. Barlow resigned from the DoD.

In the meantime, the DIS had initiated on September 28, 1989, a limited unclassified inquiry into the suspension of Mr. Barlow's security clearances. In March 1990, the DIS issued its report recommending that Mr. Barlow's clearances be reinstated. The report found that "Brubaker advised that subject is loyal to the U.S. Government and he would have no concern regarding releasing intelligence information to unauthorized persons." The report also stated that while Mr. Barlow had read a substantial amount of NFIB documents, he had done so before he was notified of his termination. Pl.'s App. 117. Although his Top Secret security clearance was reinstated, his access to SCI mate-

rial was never reinstated. Despite having his clearance restored, Mr. Barlow had problems securing clearance when, subsequent to March 1990, he was hired by the DoD for a temporary ten day employment.

In the Fall of 1990, the DoD Inspector General's Office initiated an inquiry into Mr. Barlow's allegations of reprisal after it "became aware of unusual personnel actions taken with respect to Barlow." Pl.'s App. 52 at 1592. On August 30, 1991, Captain D.M. Horstman, the Director of the DoD Inspector General Special Inquiries section, issued the report of its investigation. The DoD report found that Mr. Barlow's discussions with Mr. Brubaker on or about July 19, 1989, constituted protected disclosures under the WPA and that Mr. Barlow's termination and security clearance suspension constituted unfavorable personnel action within the meaning of the statute. The report concluded however that the WPA had not been violated because "Mr. Brubaker would have taken the unfavorable action absent the protected disclosure." Pl.'s App. 52 at 1598. The report also found that Mr. Barlow's security clearance was suspended for legitimate reasons unrelated to his alleged disclosures.

The DoD Criminal Investigative Service ("DCIS") meanwhile conducted a parallel investigation into Mr. Barlow's allegations that Undersecretary of Defense Hughes had testified falsely on August 2, 1989, regarding the nuclear delivery capability of the F–16s sold to Pakistan. On December 24, 1991, the DCIS issued its report. The report concluded that there were "no indications of willful misleading testimony."

On May 22, 1991, the DCIS referred Mr. Barlow's allegations of CIA wrongdoing to the CIA. Included among the allegations was Mr. Barlow's allegation that Ret. Gen. Einsel's March 8, 1989 testimony and John Doe's July 12, 1989 testimony, were false and misleading. The CIA issued its report on December 4, 1991. The report concluded that neither Ret. Gen. Einsel nor John Doe had misled Congress by withholding information or providing false information.

On May 10, 1991, the DCIS sent a memorandum to the State Department referring Mr. Barlow's allegations concerning the ac-

tions of State Department officials. On June 10, 1992, the State Department Inspector General, Sherman Funk, issued the report of the investigation, which concluded that there was no direct evidence that a violation of law had occurred. Nonetheless, on July 16, 1992, Inspector General Funk wrote a letter to United States Senator Bingaman of New Mexico, enclosing a copy of the report. Inspector General Funk stated that although three of Mr. Barlow's five allegations were not borne out by the investigation, Mr. Barlow's allegations were credible. Inspector General Funk noted that "Barlow's life is now a shambles, as a result of voicing—'within the system'—the views that were perceived by some in high position as unpopular and dangerous to the status quo. This is a sad commentary on how the U.S. Government treats employees with insight, integrity, and courage." Pl.'s App. 60. In response to Inspector General Funk's letter, Senator Bingaman urged the DoD to reopen its investigation into Mr. Barlow's allegations of reprisal. On August 17, 1992, DoD's Inspector General, Derek Vander Shaaf, informed Senator Bingaman that he declined to reopen the investigation.

On October 14, 1992, Captain Horstman wrote to DoD Inspector General Vander Shaaf noting that Congressional staff members had indicated that "[t]here is a good argument to conduct a new investigation based solely on the need to resolve a most unusual disagreement between two highly regarded Executive Branch IGs [State Department and DoD]." Pl.'s App. 61. On October 16, Captain Horstman and the DoD Special Inquiries group issued a second report into Mr. Barlow's allegations in which they reviewed the prior DoD investigation and reported on a meeting between the DoD Special Inquiries group and the Department of State Inspector General. The meeting took place in order to look into the continuing inconsistency between the two agencies regarding Mr. Barlow's termination and suspension of his security clearance. The DoD concluded that it would not reopen its investigation.

On March 17, 1993, Senator Bingaman again wrote the DoD urging a reinvestiga-

tion. The Senator included a sworn statement from Mr. Oplinger, Mr. Barlow's first supervisor at DoD, contesting the accuracy of statements attributed to Mr. Oplinger in the 1991 DoD report. A joint investigation lead by the DoD Inspector General's office and assisted by the CIA Inspector General Fred Hitz and the State Department Inspector General Funk followed.

On November 4, 1993, the DoD, CIA, and State Department Inspector Generals issued the joint report. The joint report concluded that "there was no reprisal, and the termination was legally sufficient given the minimal regulatory standards required to terminate a probationary employee." Pl.'s App. 57 at B2116. The report also reiterated the conclusions of the 1991 DIS investigation into the suspension of Mr. Barlow's security clearance.

On September 17, 1993, after reviewing a draft of the joint report, State Department Inspector General Funk wrote a memorandum to Deputy Inspector General of the DoD, Vander Schaaf, expressing his concern with the report's conclusion that Mr. Barlow's termination was "legally sufficient." Pl.'s App. 58 at B0395–96. In particular, Inspector General Funk did not think the report's conclusion was supported by its factual findings. Inspector General Funk also expressed concern over the effect of the suspension of Mr. Barlow's security clearance. The report was eventually issued without incorporating Mr. Funk's concerns.

On December 13, 1993, Inspector General Funk wrote to Senator Bingaman withdrawing his approval of the joint report. In his opinion the summary and conclusions contained language that contradicted the body of the report. On December 20, 1993, Deputy Inspector General Vander Schaaf informed Inspector General Funk that he stood behind the conclusions of the report.

On March 4, 1996, Senators Strom Thurmond and Sam Nunn requested the U.S. General Accounting Office ("GAO") to review the 1993 joint report to determine whether the report's conclusions were adequately supported. On July 19, 1997, the GAO issued its report. The report found that the 1993 "investigative report and files did not fully sup-

port the report's conclusions that there was no reprisal and that the proposed termination notice was legally sufficient." This reference eventually followed.

## DISCUSSION

### *Defendant's Motion to Strike*

Plaintiff asserts four causes of action: violation of the Whistleblower Protection Act; wrongful termination; intentional infliction of emotional distress; and blacklisting. In plaintiff's motion for summary judgment, he discusses his post traumatic stress disorder diagnosis in connection with the alleged claim of intentional infliction of emotional distress. Defendant objects because it understood this issue to be reserved only for the damages phase of the trial. Defendant's motion to strike requests the removal of references to Mr. Barlow's alleged PTSD from plaintiff's motion for summary judgment and his response to defendant's motion for summary judgment. Defendant argues that it would be prejudiced if the references remain in plaintiff's motion. Defendant reminds the court that it agreed to stay discovery with respect to Mr. Barlow's mental condition, delaying a possible RCFC 35 examination until after a liability determination. Alternatively, defendant argues that if its motion to strike is denied, the court should consider the contrary evidence that shows Mr. Barlow did not suffer from PTSD, evidence which, according to defendant, raises a genuine issue of material fact.

Although not raised in the context of the WPA claim, plaintiff refers to Mr. Barlow's diagnosis in the context of its common law tort claims for wrongful termination and the intentional infliction of emotional distress. Contrary to defendant's argument, the defendant was on notice that plaintiff planned to bring tort claims in addition to its WPA claim. The plaintiff's failure to amend its complaint is not a bar to bringing those claims because the claims have been discussed during the proceedings in this case. *See* September 21, 2000 Tr. at 8; July 13, 2000 Tr. at 21. Thus, the defendant has not been prejudiced by plaintiff's mere assertion of the tort claims.

The question remains whether, in the context of those claims, reference to Mr. Barlow's diagnosis is prejudicial to the defendant. Although plaintiff refers to the diagnosis in the portion of its brief that addresses its claim for wrongful termination, the diagnosis does not, as a matter of law, go to any element of that claim. As we understand it, the assertion only goes to the damages plaintiff might recover if it is successful on the wrongful termination claim. Thus, having stayed discovery with respect to Mr. Barlow's mental condition until a liability determination has been made, defendant cannot be said to be prejudiced.

The same is not true, however, with respect to the claim for the intentional infliction of emotional distress. Plaintiff's mental condition may be relevant to show that the government's actions in fact caused Mr. Barlow severe emotional distress. *See Restatement (Second) of Torts* § 46 at 71 (1965). We think defendant's objection "goes to the very substance of [plaintiff's] summary judgment motion, and is, therefore, improperly postured in the context of a motion to strike the pleading." *Oglala Sioux Tribe v. United States,* 15 Cl.Ct. 615, 618 (1988). Defendant's contention will be addressed in connection with its response to the substance of plaintiff's motion, specifically, whether the government is entitled to further discovery on what may be a disputed issue of material fact. In sum, we deny defendant's motion to strike all references to Mr. Barlow's diagnosis with PTSD.

### *Defendant's Motion for Summary Judgment*

Both defendant and plaintiff have moved for summary judgment. Many issues raised in defendant's motion for summary judgment are mirrored in plaintiff's cross-motion for summary judgment and will not be separately addressed there. Summary judgment is appropriate when there is a lack of disputed material facts and the moving party is entitled to judgment as a matter of law. RCFC 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment may be properly used in a congressional reference. As observed in *Kanehl v. United States,* 38 Fed.Cl. 89, 98 (1997), "Appendix D to the Rules of the

Court of Federal Claims now directs the Court to apply the RCFC to the extent feasible in congressional reference cases. RCFC App. D ¶ 1 (1994). Indeed, this Court has held that summary judgment may be proper in a congressional reference case." We address defendant's motion first.

1. Laches

■ Defendant argues that the doctrine of laches should bar Mr. Barlow's equitable claims. In order to maintain a defense of laches the defendant must prove that Mr. Barlow "unreasonably and inexcusably" delayed the assertion of the claim, and that this delay resulted in injury or prejudice to the party against whom the claim was asserted. *Kanehl,* 38 Fed.Cl. at 105 (citing *Deering v. United States,* 223 Ct.Cl. 342, 620 F.2d 242 (1980)).

■ Defendant claims that plaintiff unreasonably delayed this action by more than nine years, to defendant's prejudice. Defendant points specifically to its inability to depose Mr. Brubaker regarding plaintiff's new allegations of intentional infliction of emotional distress. Plaintiff responds that the seven investigations into plaintiff's allegations of wrongdoing put the government on notice of the grounds for the possible claims. He also points to the interviews taken under oath during numerous investigations which provide defendant with material upon which to base a defense.

We believe that the plaintiff's delay in bringing this action is not a complete bar to recovery. The government conducted seven investigations between the time Mr. Barlow resigned and when this congressional reference was filed, making plaintiff's delay more excusable. Mr. Barlow's inquiry to the OSC, discussed below, led him to believe that the special investigations were the superior way by which to resolve his grievance. On the other hand, the delay in bringing the action makes it impossible to hear the live testimony of Mr. Brubaker, the key government actor. We conclude that although laches is not an outright bar to plaintiff's recovery, the

court's inability to hear from Mr. Brubaker in person may be relevant in the final determination of where the equities lie.

2. Failure to Exhaust Administrative Remedies

■ The defendant also claims that plaintiff's failure to exhaust his administrative remedies through the Office of Special Counsel should bar the plaintiff from now asserting a WPA claim. It relies on the Civil Service Reform Act which requires that prohibited personnel practices be filed with the Office of Special Counsel, and on the WPA which states that an employee may seek redress from the MSPB or from the OSC. 5 U.S.C. §§ 1214(a)(3), 1221(a); *see also Bohac v. Dept. Agriculture,* 239 F.3d 1334, 1337 (Fed.Cir.2001). Plaintiff contends that his attorney pursued the administrative remedy by contacting the OSC. She was told by the OSC that neither it nor the MSPB would get involved in a WPA claim implicating highly-classified documents.

Plainly a phone call to the OSC is not the equivalent of exhaustion of an administrative remedy. Nevertheless, in the context of a congressional reference, we believe that plaintiff's reliance on the advice of respected counsel is sufficient to blunt this argument as a complete defense.

3. Temporary Suspension of Security Clearance

■ Defendant asks the court to reject any claim based on the temporary suspension of plaintiff's security clearance. We agree that the temporary suspension of Mr. Barlow's security clearance does not rise to a legal or equitable claim.[10] There is no legal right to a security clearance. *Dept. of the Navy v. Egan,* 484 U.S. 518, 528, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). Mr. Barlow's clearance was suspended in accordance with established security procedures. Two reliable sources raised legitimate concerns about the wisdom of continuing Mr. Barlow's security clearance. A DIA agent noted the

10. Moreover, Plaintiff's suspension occurred after Mr. Barlow was notified of his termination and, therefore, lack of access to top secret material could not have been a reason for termination.

enormous amount of classified material read by Mr. Barlow after notice of his termination. Mr. Brubaker believed he had reason to think that Mr. Barlow would provide uncleared Congressional staffers with classified information. Subsequently, a "limited inquiry" was conducted by the Defense Investigative Service, which interviewed five DIA agents and Mr. Brubaker. It was determined in March 1990 that Mr. Barlow's security clearance could be reinstated. Mr. Barlow remained in the same employment position while his security clearance was suspended. There is no indication that the purpose of the suspension was to damage Mr. Barlow's reputation.

In *Egan*, the U.S. Supreme Court held that the authority to protect classified information remains within the Executive Branch. *Id.* at 527, 108 S.Ct. 818. The Court explained that security clearance determinations are "an attempt to predict [an individual's] future behavior and to assess whether ... he might compromise sensitive information." *Id.* at 528, 108 S.Ct. 818. Therefore, "[p]redictive judgment of this kind must be made by those with the necessary expertise in protecting classified information" and, in turn, not by the courts. *Id.*

Basing a claim to relief in any way on the suspension of the clearance would inevitably draw the court into improperly second guessing executive branch offices in a highly discretionary function. We decline to do so. We therefore grant defendant's motion for summary judgment to the extent that plaintiff's claims are based on the suspension of his security clearance.

**4. Intentional Infliction of Emotional Distress**

■ Defendant requests summary judgment on plaintiff's claim of intentional infliction of emotional distress. Plaintiff claims that Mr. Brubaker yelled at him and became "increasingly abusive and irascible." Pl.'s Mot. for Sum. J. 32. Defendant denies that Mr. Brubaker yelled at Mr. Barlow and contends that, in any event, Mr. Brubaker did not intend to inflict emotional distress upon Mr. Barlow. Mr. Brubaker, the defendant claims, acted in the opposite manner, by

trying to find Mr. Barlow new employment. Mr. Brubaker was deposed before these allegations became clear. Thus, his deposition testimony did not address this issue and defendant is not able to fully respond to the allegations. The court finds that the late assertion of the claim for intentional infliction of emotional harm forecloses relief because its late assertion has prejudiced defendant's ability to respond.

■ Even if the claim were not foreclosed, however, we would reject the argument on its merits. For the plaintiff to prove intentional infliction of emotional distress he must show, at a minimum, that the defendant "by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress to another ..." *Restatement (Second) of Torts* § 46, at 71 (1965). Although the threshold for proving outrageous conduct may be lower when the allegations are against an employer by an employee, *see Perry v. Ethan Allen, Inc.*, No. 2.94–CV–24, 1994 U.S.Dist. LEXIS 21435, at \*8–\*9 (D.Vt. Sept. 22, 1994), there is no evidence to support the claim other than Mr. Barlow's assertion.

■ The first two elements are not satisfied. The plaintiff has offered no motive for Mr. Brubaker to intentionally inflict emotional distress on Mr. Barlow. Indeed, it is uncontroverted that Mr. Brubaker helped plaintiff obtain his job at the Office of Non–Proliferation Policy and subsequently attempted to find him alternative employment. Assuming, without finding, that Mr. Brubaker in fact yelled at plaintiff and that this conduct was somehow reckless of its consequences, this conduct is not "outrageous" or extreme. If yelling at a person, without more, were sufficient, mere disagreement would be actionable. We find there is no basis in law or equity to grant relief on this claim. Accordingly, the court grants summary judgment for the defendant on the plaintiff's claim of intentional infliction of emotional distress.

**5. Blacklisting**

■ Defendant and plaintiff both request summary judgment on the claim of blacklist-

ing. There is little precedent on the subject, but the decision of this court in *Estate of Braude v. United States*, 35 Fed.Cl. 99 (1996), holds that blacklisting of an employee that tortiously prevents the employee from securing employment with a federal agency constitutes an equitable claim. Wrongful blacklisting by the United States is thus arguably tortious behavior and forms an equitable basis for recovery. Blacklisting occurs when "an individual, or group of individuals acting in concert, disseminates damaging information which affirmatively prevents another person from finding employment." *Id.* at 112. Plaintiff contends that the suspension of his security clearance affected his potential employability. The court's treatment of the security clearance suspension has been discussed above and is not considered a ground upon which relief may based. With this in mind, the only support for a blacklisting claim is that the government fabricated a reason for terminating Mr. Barlow. This sham reason for termination allegedly created the false belief that he had a performance problem. Mr. Barlow alleges that this belief prevented him from finding employment.

■ The fact that Mr. Barlow's termination from the Office of Non–Proliferation Policy reduced his employability is not enough in itself constitute blacklisting. *Braude* held that an employee cannot claim that he has been blacklisted if the information disseminated about him is truthful. *Id.* at 113–14; *Su v. M/V Southern Aster,* 978 F.2d 462, 475 (9th Cir.1992) (stating that no blacklisting exists where information was "accurate and true"). "[R]emarks that honestly describe a worker's prior history generally are to be encouraged rather than deemed wrongful and tortious." *Braude* at 113. In the case at bar, the plaintiff has not given any specific examples of false information that was disseminated about him and that prevented him from gaining employment.[11] Reporting that Mr. Barlow lost his security clearance for a time is not inaccurate.

On the other hand, defendant points out that Mr. Brubaker contacted Mr. Maloof in order to secure employment for Mr. Barlow and that Mr. Kniaz assisted Mr. Barlow in finding temporary employment in several positions within the DoD. It is Mr. Barlow who resigned from the DoD on February 27, 1992 because he was not satisfied with the types of jobs he received. The court concludes that Mr. Barlow does not have a compensable claim for blacklisting and grants summary judgment for the defendant.

6. Whistleblower Protection Act

■ Defendant also contends that summary judgment should be granted in its favor because plaintiff will not be able to establish the elements needed for the WPA claim. The Whistleblower Protection Act declares that an employee who has authority to take any personnel action shall not:

(8) take or fail to take, ... a personnel action with respect to any employee ... because of—

(A) any disclosure of information by an employee ... which the employee ... reasonably believes evidences—

(i) a violation of any law, rule, or regulation, or

(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety,

if such disclosure is not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs
. . . .

5 U.S.C. § 2302(b)(8) (1994). Plaintiff thus must prove that: (1) the relevant official has the authority to take, recommend, or approve any personnel action; (2) the employee made a protected disclosure; (3) the acting official used his authority to take an adverse personnel action against the aggrieved employee; and (4) the official took the action because of a protected disclosure. *Lachance v. White,* 174 F.3d 1378, 1380 (Fed.Cir.1999). Defen-

---

11. Mr. Brubaker's assessments of Mr. Barlow's performance are no more than the typical, par-

tially objective, partially subjective assessments made by managers about subordinates.

dant argues that the plaintiff did not disclose a violation of a "law, rule, or regulation" and that the "disclosure," if any, is not a "protected disclosure" because the information was classified. Alternatively, defendant argues that any disclosure made by Mr. Barlow is insignificant because it was not a contributing factor in his proposed termination. In short, he would have been released in any event.

The court understands plaintiff's WPA claim to involve one alleged act that constituted a violation of law, the CIA agent's testimony before the House Foreign Affairs Subcommittee on Asian–Pacific Affairs given on July 12, 1989. In light of the supplemental briefing, plaintiff now asserts that Mr. Barlow may reasonably have believed that there were four statutes violated by the CIA agent's testimony. The first makes it a crime to make false or misleading statements to Congress:

> (a) Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals, or covers up by any trick, scheme or device a material fact, or makes any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1001 (1989). The second statute makes it a crime to obstruct justice by impeding an inquiry by Congress:

> Whoever corruptly ... influences, obstructs, or impedes or endeavors to influence, obstruct, or impede ... the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee or the Congress—
>
> Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1505. The third statute criminalizes false testimony given under oath before any tribunal competent to administer an oath to tell the truth. 18 U.S.C. § 1621. The fourth statute is specific to the Nuclear Non–Proliferation Act of 1978. It mandated that the DoD, State Department, ACDA, Department of Commerce, Department of Energy, and the NRC:

> keep the Committees on Foreign Relations and Governmental Affairs Committee of the Senate and the Committee on Foreign Affairs of the House of Representatives fully and currently informed with respect to their activities to carry out the purposes and policies of this chapter and to otherwise prevent proliferation, and with respect to the current activities of foreign nations which are of significance from the proliferation standpoint.

22 U.S.C. § 3282(c) (1989).[12]

Two events form the basis for the alleged "protected disclosure." One took place on July 12 or 13, 1989 after the NEVWG meeting when Mr. Barlow approached Mr. Brubaker after he learned of the testimony by the CIA agent before the House Foreign Affairs Subcommittee on Asian–Pacific Affairs. The second event was the subsequent meeting between Mr. Barlow and Mr. Brubaker that occurred on or about July 19, 1989.

There is some support for these allegations. Plaintiff cites Mr. Brubaker's testimony about Mr. Barlow DoD's investigation: "What he said was that ... he implied that the committee was not told the truth or was given partial information or a partial picture, which Barlow regards as, you know, incomplete or wrong ..." Mr. Brubaker's August 3, 1989 memo also stated that Mr. Barlow "said he had learned that CIA and State representatives had created a misleading picture of Pakistan's activities." On August 11, 1989, Mr. Brubaker's memorandum states that Mr. Barlow had "learned that Congressman Solarz and Congressional staff had been given a misleading and incomplete picture regarding Pakistan's illicit procurement activities in the U.S. He noted in particular

---

**12.** In plaintiff's supplemental brief he does not clearly explain how the July 12 testimony violated these statutory prohibitions. We will assume that plaintiff alleges a sufficient connection between these statutes and the July 12, 1989 testimony.

that his former supervisor at the CIA [John Doe], had made misstatements."

Defendant contests these factual assertions. It claims that Mr. Barlow never alerted Mr. Brubaker to the fact that the testimony was misleading or untruthful. Defendant relies on Mr. Barlow's deposition in the pending case, dated April 19, 2000:

Q: Is it your position today that—and we talked about the July 1989 hearing to a limited extent—but is it your position today that Congress was lied to during the course of that hearing?

A: The hearing with [the CIA agent]?

Q: With [the CIA agent].

A: Just give me a moment. That's a serious matter. I was not at the hearing. Okay? You know, so everything I know about that hearing, of what transpired at that hearing is hearsay.

. . . .

A: I did not—I did not tell him [Mr. Brubaker] that [the CIA agent] was lying. I told him . . .

Q: What did you tell him?

A: I accurately reported back what Mr. Schwartz had said, and what our reaction as a group, and my reaction was to this whole thing. And that my intention was to call out there, as I then did, with his permission, to find out what had happened.

. . . .

Q: Did you indicate to Mr. Brubaker that you thought that [the CIA agent's] omissions were not of an innocent nature?

A: I don't recall. I doubt it. At that point, no, because I certainly didn't reach that conclusion—well, I still don't know, you know. But I hadn't talked to Charlie or [the CIA agent] when I had that discussion.

. . . .

Q: Okay. So is it fair to say that you also did not tell Mr. Brubaker that you thought something illegal was afoot as a result of that testimony?

A: Certainly not. Not at that point, that's for sure.

Q: Did you ever tell Mr. Brubaker that you thought [the CIA agent] may have been engaging in illegal activity in giving the testimony he gave?

A: I don't think I ever said that to him.

We are left with a material factual dispute regarding the content of the statements made by Mr. Barlow to Mr. Brubaker. For plaintiff to successfully claim a WPA violation, he must demonstrate that Mr. Barlow actually disclosed information that he believed evidenced "a violation of any law, rule, or regulation." Although there does not have to be an actual violation of a "law, rule or regulation," Mr. Barlow must demonstrate that at the time of the disclosure he reasonably believed there was a violation and made this belief known to Mr. Brubaker. It may be reasonable for Mr. Barlow to believe that the CIA agent's testimony was a violation of law, but it is not undisputed what he said to Mr. Brubaker. There is conflicting testimony, in short, as to what Mr. Barlow told Mr. Brubaker.

Even if a disclosure by Mr. Barlow is found to fall within the WPA, defendant contends that, in order to be protected, the information disclosed cannot be "specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs." 5 U.S.C. § 2302(b)(8). *See* Def's Mot. for Sum. J. at 41. The conversation between Mr. Barlow and Mr. Brubaker on July 12 or 13, 1989 did not contain classified information. Mr. Barlow either told Mr. Brubaker that the testimony given by the CIA agent was misleading, inaccurate, and a lie, or he told Mr. Brubaker that the testimony may have been misleading and incomplete. Either way, no classified information appears to have been disclosed. The fact that on or about July 19, 1989, Mr. Barlow told Mr. Brubaker that he planned to tell Congressional staffers of his concerns regarding the John Doe testimony would not make the initial disclosure any less protected. Nor does the fact the Mr. Barlow told Mr. Brubaker that he wanted to speak with Congressional staffers make the July conversation with Mr. Brubaker itself "classified." [13]

---

13. On the other hand, the fact that Mr. Barlow      planned to tell uncertified Congressional staffers

The WPA requires that adverse personnel action be taken because of the disclosure of information. Defendant argues, alternatively, that even if the disclosure is protected by the WPA it is not actionable because the disclosure was not a contributing factor in the adverse employment action.

Plaintiff may use circumstantial evidence to prove that the personnel action was taken because of the disclosure. The WPA states that:

The employee may demonstrate that the disclosure was a contributing factor in the personnel action through circumstantial evidence, such as evidence that—

(A) the official taking the personnel action knew of the disclosure; and

(B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action.

5 U.S.C. § 1221(e)(1).

Defendant offers Mr. Brubaker's notes of April 1, 1989, along with Mr. Oplinger's corroborating testimony to demonstrate that Mr. Brubaker had problems with Mr. Barlow's performance from the beginning of his tenure at the Office of NonProliferation Policy. Defendant also points to the July 19th meeting between Mr. Barlow and Mr. Brubaker when Mr. Barlow allegedly threatened to go to uncleared congressional staffers and "set them straight." Defendant argues, in its supplemental brief, that this independently would have breached Executive Order No. 12356. That order, effective on August 1, 1982, states the following in relevant part:

Sec. 4.1 General Restrictions on Access.

(c) Classified information shall not be disseminated outside the executive branch except under conditions that ensure that the information will be given protection equivalent to that afforded within the executive branch.

(d) Except as provided by directives issued by the President through the National Security Council, classified information

classified information may give defendant a reason for legitimate termination of Mr. Barlow's

originating in one agency may not be disseminated outside any other agency to which it has been made available without the consent of the originating agency. For purposes of this Section, the Department of Defense shall be considered one agency.

Plaintiff points to other evidence in the record suggesting that, Mr. Brubaker did view a connection between Mr. Barlow's July statement and the subsequent planned termination. Mr. Brubaker wrote a memo for the record on August 3, 1989 outlining reasons for Mr. Barlow's termination. This included Mr. Barlow's disclosure of July 19, 1989. Plaintiff also points to other circumstantial evidence. The personnel action occurred within less than a month of his disclosure, with no evidence of misconduct between the time of the disclosure and the time of the notice of termination.

The plaintiff has presented enough evidence to overcome a motion for summary judgment on the issue of the WPA claim. Resolution of the WPA claim in favor of the defendant would not be proper before a trial on the merits. Therefore the court denies the defendant's motion for summary judgment with regard to plaintiff's WPA claim.

Defendant also claims that even if plaintiff could establish the elements required by the WPA, Mr. Barlow's recovery is limited as a matter of law by the WPA. Because the WPA claim is still unresolved, we preserve this issue for determination in connection with trial.

*Plaintiff's Motion for Summary Judgment*

■ Plaintiff moves for summary judgment on his claim of violation of a common law tort of wrongful termination. This claim is factually related to the WPA claim but its elements are derived from common law. The elements plaintiff offers are:

an employee must establish that she has been discharged; second, she must demonstrate that her discharge was in retaliation for her activities; and, finally, she must show that the discharge violates a clear mandate of public policy.

employment.

*Belline v. K–Mart Corp.*, 940 F.2d 184, 186 (7th Cir.1991). For purposes of resolving the pending motions we will assume these elements constitute the relevant test. Mr. Barlow's termination (or forced resignation) on August 27, 1989 satisfies the first element. However, as discussed in connection with the WPA claim, the plaintiff has not yet demonstrated from undisputed facts that his discharge was in retaliation for his activities. With the second element not yet established, the court need not consider whether the discharge violated public policy.

Plaintiff's summary judgment motion regarding violations of the WPA, intentional infliction of emotional distress, and blacklisting has been addressed above and is denied.

## CONCLUSION

Defendant's motion to strike is denied. Defendant's motion for summary judgment on the plaintiff's claims based on denial of security clearance, intentional infliction of emotional distress, and blacklisting are granted. Defendant's motion for summary judgment on the WPA claim is denied. Plaintiff's motion for summary judgment is denied in its entirety. The parties are directed to confer regarding procedures for resolving the WPA and wrongful termination claims. Defendant is directed to report the parties' proposals in a status report to be filed on or before January 31, 2002.