Richard M. BARLOW, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–887X.

United States Court of Federal Claims.

Filed Under Seal Aug. 19, 2002.

Reissued as Redacted Sept. 13, 2002.[1]

1. The parties' opportunity to file a notice of exception or acceptance pursuant to RCFC Appendix D, Paragraph 8, shall run from the filing of this redacted version. Redactions are indicated by ***.

Joseph A. Ostoyich, Howrey Simon Arnold & White, LLP, Washington, D.C., for plaintiff. With whom at trial were Victor Miller and Eric Andreas.

Robert E. Kirschman, Jr., with whom were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, Civil Division, Department of Justice, Washington, D.C., for defendant. Stewart F. Aly, Department of Defense, of counsel.

2. Appendix A sets out in summary form the conclusions of the various Investigator General investigations.

REPORT

BRUGGINK, Hearing Officer.

One of the reasons Richard Barlow's supervisor, Gerald Brubaker, may have proposed Mr. Barlow's termination in 1989 from a probationary position at the Department of Defense (DoD) was Mr. Brubaker's concern that Mr. Barlow was about to discuss highly classified information with staffers to the House Subcommittee on Asian–Pacific Affairs without getting appropriate permission to do so. The proposed termination might have been, and perhaps under other circumstances should have been, viewed as a routine personnel matter. The reason it was not—it had the traction to spawn four Inspector General investigations[2] within three agencies, a criminal investigation, and this Congressional Reference—is that Mr. Barlow, although a relatively junior employee, had very strongly and openly espoused views on a matter that was extremely controversial at the time—Pakistan's nuclear capabilities. After nearly four years of litigation following a Congressional Reference of his claim here, this hearing officer concludes that there was no injustice in either Mr. Barlow's proposed termination or the associated suspension of his security clearances. Any payment to him would therefore constitute a gratuity.

The request posed by the Senate, in substance,[3] was that the court investigate the circumstances surrounding Mr. Barlow's proposed termination along with the associated suspension of his security clearances. In an earlier opinion, *Barlow v. United States*, 51 Fed.Cl. 380 (2002) (*"Barlow I"*), we granted summary judgment for the United States as to claims based on suspension of plaintiff's security clearances, intentional infliction of emotional distress, and blacklisting. Familiarity with the background set forth in that opinion is assumed, although portions of those findings are included here. Left open for trial were two issues: plaintiff's "whistleblower" claim and his common law claim of wrongful termination.

3. S. 2274, 105th Cong. § 1 (1998); S.Res. 256, 105th Cong. (1998).

Consideration of the extensive record was made awkward for all parties, particularly during trial, by security concerns. In addition, the court early on permitted the assertion by the Directors of the Central Intelligence Agency and the National Security Agency of the "state secrets privilege." See Order of July 18, 2000. A limited amount of information and testimony was thus removed beyond even the court's access. Much of this dispute has its origins in a briefing conducted on July 12, 1989 before the House Subcommittee on Asian–Pacific Affairs. The transcript of that hearing was off limits in its entirety. In addition, a large amount of additional information classified at secret or above had to be redacted, although it was available to court and counsel.

Perhaps the most troubling aspect of this review was the fact that Gerald Brubaker, Mr. Barlow's immediate supervisor and the person responsible for proposing Mr. Barlow's discharge, died on April 10, 2001. The court thus did not have the benefit of live testimony from the person best situated to rebut Mr. Barlow's allegations. The court had access, however, to extensive sworn testimony preserved before Mr. Brubaker died.

Despite these limitations, the court is satisfied that it had a sufficiently complete record to make necessary findings and draw informed conclusions.

## BACKGROUND [4]

At the time of his proposed termination, Mr. Barlow was a GS–12 probationary Foreign Affairs Officer in the Office of Non–Proliferation Policy at DoD. The function of the office was to monitor the possible spread of nuclear and biological weapons of mass destruction. There were six employees in the office at the beginning of 1989. Gerald G. Oplinger was the Director. The remaining employees shared responsibilities divided along geographic and subject matter grounds. There were counterpart entities within the intelligence community and the Department of State.

Mr. Barlow's position required him, among other duties, to be aware of Pakistan's capabilities with respect to making and delivering nuclear weapons. Defendant does not dispute that Pakistan was making concerted efforts at that time to export from the United States the technology necessary to accomplish those ends. Mr. Barlow's position did not involve gathering raw intelligence, although he was obligated to keep himself informed of existing and new intelligence gathered by others, both within and outside DoD. He thus needed very high security clearances. This fact created some difficulties at the time he began working at the office. To explain that difficulty requires going back into Mr. Barlow's job history.

Mr. Barlow began his career with the United States government immediately upon receiving a bachelor's degree in Political Science from Western Washington University in June 1980. His senior thesis dealt with the proliferation of nuclear weapons into Asian countries. Upon graduating, Mr. Barlow accepted a position as a professional intern at the Arms Control and Disarmament Agency's (ACDA) Non–Proliferation Bureau, in Washington, DC. ACDA was under the authority of the Secretary of State. The mission of the ACDA was to advise the Secretary of State, the President, and the National Security Council with respect to arms control, nuclear non-proliferation, and disarmament matters, as well as to monitor compliance with existing arms control agreements. Mr. Barlow drafted briefing memos to action officers as well as "demarches," diplomatic communications ultimately sent from the State Department to foreign countries. One of the non-nuclear (at that time) countries with which ACDA was concerned was Pakistan. Although Mr. Barlow's responsibilities were not limited to Pakistan, he developed a

---

4. The court heard live testimony from Richard Barlow, Charles Burke, Marvin C \*\*\*, Elizabeth Ward McKean, Michael MacMurray, Michael Maloof, Stephen O'Toole, Victor Rostow, and John S \*\*\*. In addition to this live testimony, parties agreed that the court could rely on the depositions and sworn testimony of Gerald Brubaker, Lisa Burdick, Russell DeRitis, Sherman Funk, Robert Hathaway, Leon Kniaz, Gerald Oplinger, Robert Ream, and Jonathan Schwartz. Parties also agreed that the documentary record created for the cross-motions for summary judgment could be utilized.

great interest and expertise in Pakistan and its efforts to develop nuclear capabilities.

The internship was extended beyond the summer and Mr. Barlow cancelled plans to complete a masters program at the University of Oregon. While at ACDA, Mr. Barlow worked on, but did not complete, a masters degree at Georgetown University. His position, as well as the ACDA itself, ended after two years. Mr. Barlow spent 1982–85 in private sector employment unrelated to his Pakistan or nuclear proliferation experience.

In 1985 Mr. Barlow had the opportunity to return to the world of arms control and nuclear non-proliferation. From that year, until 1987, he was employed at the Central Intelligence Agency (CIA) in its Office of Scientific and Weapons Research. His title was "Intelligence Officer, GS–9." The Director of the Office was Gordon Oehler. The head of the *** Division within the office was Charles Burke. Mr. Barlow's immediate supervisor within the *** Branch was John S ***.

Part of the backdrop to Mr. Barlow's function at the CIA was that Congress in 1985 passed the Pressler Amendment which placed certain restrictions on U.S. aid to Pakistan. Insofar as relevant here, it made foreign assistance and military equipment sales to Pakistan contingent on the certification by the President of two things:

(e) Nuclear non-proliferation conditions on military assistance; exception (1) No assistance shall be furnished to Pakistan and no military equipment or technology shall be sold or transferred to Pakistan, pursuant to the authorities contained in this chapter or any other Act, unless the President shall have certified in writing to the Speaker of the House of Representatives and the chairman of the Committee on Foreign Relations of the Senate, during the fiscal year in which assistance is to be furnished or military equipment or technology is to be sold or transferred, that Pakistan does not possess a nuclear explosive device and that the proposed United States assistance program will reduce significantly the risk that Pakistan will possess a nuclear explosive device.

22 U.S.C. § 2375 (1994). The President, in short, had to certify annually that Pakistan did not have a nuclear bomb and that aid to Pakistan would reduce the likelihood that Pakistan would acquire one.

In addition to the Pressler Amendment, in 1985 Congress also passed the Solarz Amendment. Unlike the Pressler Amendment, the Solarz Amendment was not specific to Pakistan, but rather prohibited economic or military assistance to any non-nuclear weapon state that exported or attempted to export from the U.S. "any material, equipment, or technology which would contribute significantly to the ability of such country to manufacture a nuclear explosive device if the President determines that the material, equipment, or technology was to be used by such country in the manufacture of a nuclear explosive device."[5] 22 U.S.C. § 2429a (repealed). Unlike the Pressler certification requirement, the Solarz Amendment obligations were only triggered upon an affirmative determination by the President that U.S. technology was being exported for the purpose of nuclear proliferation.

Complicating the dynamics of relations between the United States and Pakistan at this time was the fact that the U.S. was assisting the Afghan Mujahadeen in their efforts to oust the Soviet Union and was using Pakistan as a conduit for the assistance.

Mr. Barlow's job at the CIA involved tracking the efforts of non-nuclear nations to obtain sensitive technology in violation of the Solarz export limitations. Another of his responsibilities was supplying CIA policy makers with information relevant to the Pressler Amendment certifications.

While at the CIA, Mr. Barlow participated in investigations into Pakistan's efforts to obtain nuclear components in the United States. One resulted in the arrest ***, a Pakistani native who attempted to export substances with known nuclear weapons uses from the U.S. to Pakistan. Mr. Barlow received commendations from the CIA, the

---

**5.** Although the Solarz Amendment was repealed in 1994, *see* Pub.L. 103–236, 108 Stat. 519 (1994), a similar requirement exists under 22 U.S.C. § 6301.

State Department, and the Commerce Department for his work on the investigation. Although the investigation resulted in the arrest and conviction \*\*\*, former Pakistani \*\*\* who was also a target of the \*\*\* investigation, was never apprehended. Mr. Barlow believed that State Department officials told \*\*\* about the investigation in an effort to maintain good relations between the Reagan administration and the Pakistani government. Mr. Barlow, in 1990 informed the Defense Criminal Investigative Service of his suspicion that an obstruction of justice may have occurred. Mr. Barlow's concerns were subsequently the subject of a 1991 investigation by the State Department Inspector General (IG). *See* Appendix A.

Mr. Barlow was a CIA representative to two inter-agency intelligence groups. One was the Nuclear Export Violations Working Group (NEVWG). It met to address issues related to possible violations of law with respect to the export of material and equipment related to nuclear weapons. The other was the Subgroup on Nuclear Export Control (SNEC), to which he was the sole CIA representative.

The Director of the CIA during this period was William E. Casey. His directorship also made him Chairman of the National Intelligence Council (NIC), consisting of the heads of all the government's intelligence agencies. In that capacity he was responsible for pulling together all the intelligence relevant to the annual Pressler certification. The actual recommendation to the President was made through the Secretary of State.

Director Casey designated several National Intelligence Officers (NIO's) with the task of furnishing him in his capacity as Chairman of the NIC with high level policy advice for various geographic or substantive areas of CIA responsibility. NIO's were not placed in a direct chain of command between the Director and the various operational or administrative units. He designated Retired General David W. Einsel as NIO for Nuclear Proliferation.

Director Casey had implemented a practice, apparently only during the 1987–89 time period, that General Einsel would conduct all briefings with Congress regarding Solarz and Pressler Amendment issues, at least insofar as Pakistan was concerned. One particular briefing by General Einsel figures in these events. It took place on July 22, 1987, before the House Foreign Affairs Subcommittee on South Asian Affairs. Mr. Barlow, and others, accompanied General Einsel to the top-secret briefing. During the briefing, General Einsel was asked about Pakistan's activities. He responded to several of the questions in ways that Mr. Barlow believed were inaccurate. Mr. Barlow evidently drew attention to his disagreement and then openly contradicted General Einsel's testimony during the briefing. During the trial, the Government made no attempt to defend the accuracy of General Einsel's statement. Mr. Charles Burke, Mr. Barlow's supervisor, who attended the briefing and who testified at trial, agreed with Mr. Barlow and indeed believed that the error was not accidental. We can safely assume that General Einsel's testimony was materially incorrect, although it was subsequently corrected in supplementary written submissions.

Apparently General Einsel was not amused by Mr. Barlow's behavior and, Mr. Barlow suspects, sought to have him removed from his position. Mr. Charles Burke, Mr. Barlow's second-line supervisor, intervened, however, and Mr. Barlow remained. Mr. Barlow's allegations with respect to General Einsel's testimony were later the subject of a CIA IG investigation. Although Mr. Barlow was not fired, Mr. S \*\*\*, his immediate supervisor, changed Mr. Barlow's job responsibilities to eliminate any duties in connection with Pakistan. Mr. Barlow complained to his fourth line supervisor, the Deputy Director of the CIA, Richard Kerr, who told him, according to Mr. Barlow, to ignore the nominal change in title and to "continue doing what you're doing to assist law enforcement, the Justice Department, and if anybody interferes with you, you come back to me and tell me. And those are my orders to you." Trial Tr. 84.

Mr. Burke testified at trial. He was an impressive witness. He is retired from the CIA. The court attaches particular significance to his testimony because of his candor and apparent objectivity concerning Mr. Bar-

low's strengths and weaknesses. He clearly has great respect for Mr. Barlow's intellect and expertise. Yet on the question of why Mr. S *** attempted to change Mr. Barlow's job responsibilities, he debunks any suggestion that it was a reprisal flowing from Mr. Barlow's conduct with respect to General Einsel. He persuaded the court that Mr. Burke and Mr. S ***, equally frustrated at the office's inability to make an impact with its views on Pakistan, came to the conclusion that concentrating Mr. Barlow's efforts on Pakistan was a waste of time. No one higher up asked that Mr. Barlow be pulled off of Pakistan. Mr. Burke testified that he was never able to dissuade Mr. Barlow from a more sinister interpretation of events.

In February 1988, Mr. Barlow received a promotion to GS–11. Despite his promotion, in September 1988, Mr. Barlow resigned from the CIA to take a position as a trainee investigator with the United States Customs Service. He testified at trial that this change was due to pessimism about his career prospects at the CIA. Mr. Burke gave a somewhat different version of the reasons for the departure. He testified that Mr. Barlow came to him seeking to have Mr. S ***, his immediate supervisor, removed as branch director. Alternatively, he wanted to be promoted himself. He told Mr. Burke that he could not work with Mr. S ***. Mr. Burke refused to take either action. He declined the suggestion to remove Mr. S *** because he was "one of the most capable branch chiefs." Trial Tr. 737.

Mr. Barlow completed the four months training program operated by Customs in Glyncoe, Georgia. Even before the end of that training, however, Mr. Barlow called Mr. Brubaker, a senior intelligence officer at DoD's Office of Non–Proliferation Policy, to inquire about a position. Mr. Brubaker, who was familiar with Mr. Barlow's work from his time at the CIA, thought Mr. Barlow would be a good candidate and suggested he be hired. Thus, after graduation from the Customs Academy, Mr. Barlow resigned from Customs and instead accepted a probationary position as an intelligence officer in DoD's Office of Non–Proliferation Policy, effective January 1989.[6]

Mr. Barlow explains his sudden departure from Customs and return to Washington as prompted by marital considerations. There is no question, however, that he left hard feelings behind at Customs, which had invested in his training. It also must be noted that the person responsible for helping Mr. Barlow make the transition back to intelligence work was Mr. Brubaker, who plaintiff now accuses of subsequently proposing his termination for improper reasons.

Mr. Barlow's first line supervisor at the Office of Non–Proliferation Policy was Gerald G. Oplinger. His second line supervisor was Victor Rostow, Director of the Office of Negotiations Policy. Mr. Brubaker was, at least initially, one of Mr. Barlow's non-supervisory colleagues.

Part of Mr. Barlow's job at DoD was to be familiar with relevant documents coming into the "document room." These were classified materials. Consequently, he needed not only high level clearances but *** specific access to certain *** materials. DoD did its routine background investigations prior to issuing clearances. With respect to certain materials, however, Mr. Barlow was blocked by the CIA. A notice was put up in the document room warning document handlers not to allow Mr. Barlow to access *** materials. Suspecting that the CIA's opposition had something to do with his prior employment there, Mr. Barlow went to his supervisor, Mr. Oplinger, seeking assistance. He explained his prior run-in with Gen. Einsel and that certain individuals in the CIA might be creating the problem. After Mr. Barlow explained the circumstances, Mr. Oplinger was not concerned and he had no difficulty going to bat for Mr. Barlow.[7] Mr. Kerr, Mr. Barlow's former fourth level supervisor at the

---

6. Although Mr. Barlow began his employment with the DoD in January 1989, the DoD agreed to use the beginning date of his service with Customs in September 1988 to commence the one year probationary period.

7. Victor Rostow, Mr. Barlow's second line supervisor, also called the CIA about Mr. Barlow. Despite being told, "This kid is a problem and he's your problem now," he had no concerns about Mr. Barlow. Trial Tr. 815.

CIA, also intervened. By late February Mr. Barlow obtained all the necessary clearances and access ***.[8]

In March 1989, Mr. Barlow attended another briefing, this time representing the DoD, in which Gen. Einsel briefed Congressman Solarz regarding Pakistan's nuclear weapons program. Again Mr. Barlow believed that Gen. Einsel made inaccurate and misleading statements. He discussed the briefing with Mr. Brubaker and Michael MacMurray, the DoD Pakistan Desk Officer. During this discussion Mr. Barlow told them that the testimony provided was inaccurate and misleading. This discussion is not the basis of Mr. Barlow's Whistleblower Protection Act (WPA) or wrongful termination claims.

On April 17, 1989, Mr. Barlow's immediate supervisor, Mr. Oplinger, the Director of the Office of Non–Proliferation Policy, gave Mr. Barlow his performance evaluation. Mr. Oplinger indicated that Mr. Barlow's performance to date "Exceeds Fully Successful." Mr. Rostow, Mr. Barlow's second-line supervisor and the principal Director to the Deputy Assistant Secretary of Defense for Conventional Forces and Arms Control Policy, concurred with Mr. Oplinger's recommendation, stating "Mr. Barlow is a bright, aggressive, and intelligent action officer."

Mr. Barlow makes much of this rating, attempting to contrast it with the proposed removal only five months later. The court attaches little significance to it, however. As Mr. Rostow testified at trial, a rating of "Exceeds Fully Successful" is damning with faint praise. Virtually all Action Officers such as Mr. Barlow routinely received the highest rating of "Outstanding." Being rated at a lower level "was a comment," according to Mr. Rostow. Trial Tr. 855. The narrative portion of the evaluation also suggests that Mr. Barlow's supervisors saw room for improvement:

> He has much potential, but needs more time and exposure to balance his energies across the full range of the Directorates responsibilities.

On the strength of the rating, Mr. Barlow was recommended for a promotion from GS–11 to GS–12. On April 19, 1989, the promotion was approved by James E. Hinds, Mr. Barlow's third-line supervisor, the Deputy Assistant Secretary of Defense. Mr. Hinds' memorandum recommending the promotion states in pertinent part:

> [Mr. Barlow] has demonstrated a broad knowledge of non-proliferation issues, analytical skills, and the ability to carry out the duties described in his present position description with a minimum of supervision. His performance has been at the level I would expect of a GS–12, and I recommend that he be promoted to that grade.

Mr. Barlow's promotion received final approval and became effective on June 4, 1989. He remained, however, a probationary employee.

Mr. Rostow testified that the fact that Mr. Barlow received a promotion to GS–12 as a consequence of the rating is also not of great significance, despite the fact that such a promotion would normally have come at the end of a year. He understood that Mr. Oplinger had promised Mr. Barlow an early promotion at the time of his hire, and was thus willing to accelerate it. Otherwise the rating itself would not have merited early promotion.

On April 30, 1989, Mr. Oplinger retired, and on May 1, 1989, Mr. Brubaker, who was the senior person in the Office of Non–Proliferation Policy, became Acting Director. This set the stage for succeeding events. The court has heard Mr. Barlow's live testimony and thus had the opportunity to evaluate him to that degree. It did not have the benefit of a similar opportunity with respect to Mr. Brubaker. A second hand character sketch was provided by Mr. Rostow, however. While Mr. Rostow obviously had a high regard for Mr. Barlow's intellect, and respect for Mr. Brubaker's experience, he made it clear during trial that the subsequent unhappy events were primarily a function of very large personality differences between the comparatively young Mr. Barlow and the much senior Mr. Brubaker. Despite the fact that Mr. Brubaker helped bring Mr. Barlow

---

8. The CIA's opposition to Mr. Barlow's access to *** materials included an episode in which a low-level CIA agent had Mr. Barlow removed from a briefing held overseas.

into the office, apparently five months of close working arrangements took the shine off Mr. Barlow for Mr. Brubaker. The two men simply did not like each other. One was young, brash, inexperienced, opinionated, and not concerned with protocol. The other was a long-time line employee, with little patience for the unconventional.

Even before he took over as Acting Director, Mr. Brubaker had conveyed his reservations regarding Mr. Barlow to Mr. Oplinger. In April, prior to Mr. Barlow's performance evaluation and promotion, Mr. Brubaker, approached Mr. Oplinger with concerns he had about Mr. Barlow's work performance and made it clear that he thought Mr. Barlow should not be promoted. As Mr. Oplinger testified by deposition in August 2000, "I can't recall whether there was ever a specific recommendation to fire him, but my recollection is that it was pretty clear that he [Brubaker] felt that's what should be the ultimate outcome of it, what he was recommending that I do." Oplinger 2000 Dep.Tr. 15. As early as April 1989, in other words, long before the incidents in July and August, Mr. Brubaker had made his feelings about Mr. Barlow known.

Mr. Brubaker also met with Mr. Rostow to share his concerns. Mr. Brubaker's handwritten notes of that April meeting reflect the following:[9]

We have problems—its not problem of youth—more serious.
—doesn't complete assignments
—has an agenda—enforcement
—suppose[d] to do [intelligence] support
　—doesn't read Cables
　—doesn't read ***
　　—Hasn't done reporting cable for [International Atomic Energy Agency]
—Argumentative—debates endlessly—hostile.
—May have made a mistake
　—Transfer? Inside—Outside? M.T.
　—Problem with [National Security Agency] too earlier
　—Another Speier
—don't promote now—need incentive to straighten up
　—can release within 1 year
　—GS–11 representing [Office of Secretary of Defense]?
—Holden—Head MT?—do nuclear?
—[National Security Agency] meeting problems with Speier—AGNI [name of a long range missile] launch an example

Mr. Brubaker's note, "can release within 1 year" plainly suggests that Mr. Brubaker was considering terminating Mr. Barlow as early as April.

Both Mr. Rostow and Mr. Oplinger testified that the incompatibility between plaintiff and Mr. Brubaker was a problem. At one point, Mr. Oplinger told Mr. Brubaker that he was "sorry we hired Barlow because it led to so much argument between the two of them and it was bad for the operation of [his] office . . . this was not directed solely toward Mr. Barlow's attitude or performance, but the results of the animosity between the two men." Oplinger 2000 Dep.Tr. 19.

This animosity, not surprisingly, became a bigger problem when Mr. Brubaker was named Acting Director. Both Mr. Brubaker and Mr. Barlow came to see Mr. Rostow to complain about the other. Mr. Rostow made it clear at trial that Mr. Brubaker got the position, not because of management skills, but because of seniority. He was not equipped by personality to deal with someone who Mr. Rostow characterized as vocal, brash, and virtually insubordinate.

Mr. Brubaker came to the conclusion that, despite Mr. Barlow's intellectual gifts, he was capable of extremely poor judgment. In his depositions he related two examples. One concerned Mr. Barlow's conduct at NEVWG meetings. Mr. Barlow replaced Mr. Brubaker as the Non–Proliferation Office representative to the interagency group. Mr. Brubaker later found out, however, that one of the constituent agencies, Customs, had stopped sending a representative. When he contacted an acquaintance at Customs, Mr. Brubaker found out that Mr. Barlow had

**9.** Certain portions of Mr. Brubaker's notes are illegible. We have relied on defendant's undis-　puted representation in its Proposed Findings of Fact with respect to those portions.

deeply offended the Customs representative by the hectoring way he put questions to him.

Another incident involved a former State Department employee, Elizabeth Ward McKean, who testified at trial. She worked with Mr. Barlow at the ACDA. Later, while she was at State and Mr. Barlow was at DoD, they often had occasion to collaborate on drafting cables for the Secretary of State. Such cables might originate in one agency and then be forwarded for comment to other relevant agencies. She had originated one such cable which had been copied for comment to Mr. Barlow. The cable had no time sensitivity. Ms. McKean was sick during the comment period and was at home when she received a phone call from Mr. Barlow critiquing her draft in what she characterized as "insulting" terms. The tone of his conversation during the phone call was typical for him, she testified, namely, breathless and dramatic. She also indicated that his demeanor at NEVWG meetings was "obsessive." Apparently her complaints about this phone call made their way to Mr. Brubaker.

According to Mr. Brubaker, he had been contemplating recommending termination of Mr. Barlow prior to this time, particularly in view of the approaching end of the one year probationary period. His April notes bear this out. For him, the precipitating event concerned Mr. Barlow's activities with respect to the classified documents reading room. Mr. Brubaker testified that one of Mr. Barlow's responsibilities was to keep up on new documents called to his attention. Mr. Brubaker, suspecting that Mr. Barlow was not doing enough reading, checked the logs of the reading room and discovered that Mr. Barlow was reading only a small portion of relevant documents, and that that number only involved Pakistan. Mr. Barlow apparently found out about Mr. Brubaker's investigating, and made a sudden effort to catch up on his reading. In two days, he apparently

did so. For Mr. Brubaker, however, it was the "last straw" and ultimately lead to the proposed termination. Brubaker 1991 Inter.Tr. 28. As will be seen below, however, it is impossible to completely extricate this rationale from subsequent events.

Another series of related events occurred at roughly the same time which Mr. Brubaker characterizes as peripheral to the decision to terminate, but which Mr. Barlow claims constitutes the real, and improper reason for the proposal.

At this point, it becomes necessary to piece together what is known about the July 12, 1989 briefing of the House Subcommittee on Asian–Pacific Affairs, an event which figures prominently, albeit indirectly in Mr. Barlow's departure from DoD. A transcript of the congressional briefing exists, however, as mentioned before, it was made off limits to court and counsel due to security concerns. Nevertheless, sufficient details of the briefing can be pieced together without compromising those concerns to aid the court in answering the relevant questions.

The chairman of the subcommittee, Rep. Stephen Solarz, asked the CIA to brief the subcommittee on matters relevant to Solarz and Pressler Amendments issues. The committee furnished written questions to the CIA in advance of the briefing. Such requests were always routed through the Congressional Liaison Office to the relevant CIA personnel. In this case, the lead individual responsible for gathering the data and answering most questions was John S ***, Mr. Barlow's former supervisor at the CIA.[10] Mr. S *** was in charge not only of gathering the data but ensuring that its disclosure to the subcommittee members would not breach security concerns. In attendance at the meeting, in addition to committee members and a few subcommittee staffers with substantial security clearances,[11] were Gordon Oehler,

---

10. Mr. S *** is also referred to as John Doe in many related materials.

11. Mr. Robert M. Hathaway was a professional staff member for the Subcommittee on Asian–Pacific Affairs. He also served as Rep. Solarz' press secretary. When asked if he attended the briefing related to Pakistan, he responded that

"[t]o the best of my knowledge and recollection, I attended all of them ... I would have been the one scheduling it and I wouldn't have scheduled it, if I couldn't be there." Hathaway Depo.Tr. 30. Mr. Burke has a different recollection, and testified that Mr. Hathaway was not at the briefing. Mr. Burke also stated that Mr. Hathaway

who was the new NIO, Mr. S \*\*\*, Elizabeth S \*\*\*, Charles Burke, Marvin C \*\*\*, and two to three others from CIA. Mr. S \*\*\* and Ms. S \*\*\* were the principal briefers. He and Ms. S \*\*\* answered the questions submitted by the committee by reading prepared statements. In addition to the written responses to the questions furnished in advance, Mr. S \*\*\* had before him internal briefing materials, prepping him with respect to anticipated oral questions that might come up during the briefing. The briefing took approximately an hour and a half.

The court heard from three witnesses who attended this briefing. Charles Burke and Marvin C \*\*\* attended, but did not speak at the briefing. John S \*\*\* answered most of the Representatives' questions. He addressed, among other things, Pakistan's nuclear capabilities. After Mr. S \*\*\* and the other CIA representatives read the prepared answers, there were perhaps one to two dozen spontaneous questions from the Representatives, some of which went beyond the prepared talking points. The CIA representative with the most knowledge in the particular field would respond to the question.

Mr. Burke explained a dynamic that constrained Mr. S \*\*\*'s ability to respond to the questions fully. A briefing on intelligence matters such as the one at issue is classified by the briefing agency at a certain level. Although it is not entirely clear from the record at precisely what level this briefing was conducted, it was at a very high level, although one that was still subject to restrictions.[12] This knowledge gave guidance to the individuals who prepared the written responses as well as Mr. S \*\*\* in answering questions. As Mr. Burke explained, Mr. S \*\*\* was in a "box." He could not go outside the box in answering questions. Despite the high level of classification of the briefing, there was space outside the box. This may have consisted of \*\*\* information. This meant that, although the persons in attendance had clearances, they may not have been cleared as having a "need to know" the par-

ticular information that was being requested. In this respect, Mr. S \*\*\* was not at full liberty to divulge information that was strictly "need to know."

Another limiting aspect of the "box" concerns whether the information requested was classified as "ORCON."[13] With respect to such materials, there is a distinction between the right of access and the right to share the information with others, even if the other individual has the requisite clearances. Access to ORCON materials is controlled by the entity that originated the material. Mr. S \*\*\*, in other words, may have had access to everything in front of him but, not necessarily have had permission to share that information without first checking with the originating agency. These security concerns are primarily directed at protecting sources and methods of intelligence gathering.

Chairman Solarz, by virtue of being subcommittee chairman, was on the House Select Intelligence Committee. He therefore had clearances above and access to information beyond that possessed by other subcommittee members. Mr. S \*\*\* was thus, according both to him and to Mr. Burke, in a very awkward position when Rep. Solarz asked questions which could only be answered by disclosing information beyond the classification level of the briefing. Because of his concerns, Mr. S \*\*\* testified within the limits of his authority, and truthfully, but, according to Mr. Burke, in a very hesitating manner.

The court heard from Mr. S \*\*\*. He struck the court as completely candid and honest. However, it is easy to visualize why his manner might prompt someone, particularly given the setting at the subcommittee hearing, to suspect he was not disclosing all the facts. Even during trial, he was painfully meticulous and literal in his answers to routine questions. He was also without any inflection or emotion in his responses. Apparently Rep. Solarz indicated during the briefing that he was concerned that Mr. S \*\*\* was being

may have been privy to much of the "need to know" information.

**12.** The specific level is protected under State Secrets.

**13.** ORCON is an acronym for "organizational control." It means that only the agency that collected the intelligence controls its dissemination.

evasive. Mr. Burke's explanation that this was simply an unfortunate artifact of Mr. S ***'s manner rings true.

In any event, Mr. S ***'s hesitancy during the briefing was understandable. Agency protocol in answering questions demands that the response not give away any hint of the answer to questions that cannot be addressed. Mr. Burke explained that Mr. S *** was particularly thrown off track by the fact that Rep. Solarz was asking questions that, in his view, called for information beyond the briefing clearance; i.e., they were based on information Congressman Solarz could only have had access to by virtue of his membership on the House Intelligence Committee.

Mr. Burke and Mr. S *** persuade the court that Mr. S *** answered truthfully the questions put to him. He may well have left an impression that he was trying to hide something, but this was a reflection both of his demeanor and the restrictions he was operating under. To the extent he spoke, he spoke truthfully. Moreover, subcommittee members were also assured, before the briefing ended, that the CIA would furnish the subcommittee with additional information responsive to the oral questions.

This July 12 briefing, and Mr. Barlow's suspicions about what was said or not said, form the basis of Mr. Barlow's whistleblower and wrongful termination claims. As explained below, it would have been a violation of law if Mr. S *** had furnished false information to the subcommittee. Mr. Barlow contends that he was threatened with termination for disclosing his suspicions about the briefing to Mr. Brubaker. This hearing officer is persuaded, as explained above, that there was no violation of law. That does not end the inquiry, however. Mr. Barlow could be wrong about his suspicions and yet be improperly punished for raising them. The critical questions become, "were Mr. Barlow's suspicions reasonable, and was he punished because he raised them?"

Mr. Barlow learned of the briefing a few days before it took place. He tried to gain admittance. He first called the CIA and spoke to the Office of Congressional Affairs, where he was informed that the briefing was "CIA-only." He then asked Mr. Hathaway, a subcommittee staffer, the day before the meeting, if he could attend. Mr. Hathaway explained that it was too late to add him but ensured Mr. Barlow that he would be invited to future briefings on the subject of Pakistan. Mr. Brubaker states, contrary to Mr. Barlow's recollection, that he did not ask Mr. Barlow to seek admission to the hearing and that, in fact, had there been a request for a DoD representative from the Non–Proliferation Office, Mr. Brubaker himself would have gone.

Although Mr. Barlow did not attend the July 12 briefing, he did attend a meeting the following day of the NEVWG. At the meeting, the members were briefed by Jonathan Schwartz of the State Department Legal Advisor's Office on what had occurred in the congressional briefing the previous day. Mr. Schwartz had attended the briefing. Mr. Barlow understood Mr. Schwartz to be saying that Mr. S ***'s statements regarding Pakistan may have left the subcommittee with the impression that the answers were misleading or incomplete. Specifically, Mr. Barlow recalled during trial that, according to Mr. Schwartz, Mr. S *** had used a number in his testimony in response to a question about the volume of incidents of potential Pakistani procurement violations that Mr. Barlow thought was inaccurate.[14]

Mr. Schwartz did not testify at trial. Although he was deposed, he did not have any independent recall of the briefing.[15]

After the NEVWG meeting, on July 13th or 14th, Mr. Barlow approached Mr. Brubaker to express his concerns about what he had heard. Apparently it was a brief conversation. Mr. Barlow told Mr. Brubaker that he wanted to contact the CIA to find out what had happened at the subcommittee briefing.

14. The exact numbers involved have been withheld on State Secrets grounds.

15. *But see Barlow I*, 51 Fed.Cl. at 385, in which reference is made to a statement he gave under oath during a 1992 State Department IG investigation. The court did not allow the report into evidence at trial.

Mr. Brubaker granted him permission to do so. As Mr. Barlow characterized his response at trial, Mr. Brubaker "had no reaction."

Defendant maintains that Mr. Barlow in fact only relayed to Mr. Brubaker his belief that John Doe's testimony may have contained misleading information, that he had not formed a belief as to whether the testimony was in fact misleading and inaccurate, and that he never told Mr. Brubaker that Mr. S *** lied to Congress.

The precise words Mr. Barlow used during this conversation are not clear nor is it clear how many subsequent conversations took place on the subject. Mr. Barlow's recollections have changed over time. During trial, he testified that he told Mr. Brubaker that he believed John S ***'s testimony was misleading and inaccurate and that John S *** had lied. He states that:

> there was no doubt in my mind based on what Mr. Schwartz had told us, ... that the CIA had provided willfully false testimony to Congressman Solarz' committee that day. No doubt at all.... I told [Mr. Brubaker] specifically that in my view there had been a clear-cut violation of law by the CIA....

Trial Tr. 224–25.

This certitude contrasts with his testimony during cross-examination. Mr. Barlow testified that "I told [Mr. Brubaker] there was a possibility he was lying." He was then asked, "But you did not tell Mr. Brubaker that John S *** had been lying?" He answered, "As a fact? No." Trial Tr. 391.

It contrasts even more sharply with his earlier statements. Mr. Barlow's testimony in the IG Joint Investigation in April 1993 was less adamant: "I never said that anybody was lying. I didn't know what was going on. I spoke to Mr. Burke and all I was trying to do was help out ..." Trial Tr. 356 (quoting 1993 interview testimony). In a 1989 written statement, moreover, Mr. Barlow stated that "I had absolutely no knowl-

edge of what took place in the hearing. I did not know what questions were posed to the CIA by the Committee or what answers were provided, just the general subject." Def.Ex. 13. He stated further, as he did at trial, that Mr. Schwartz told him that it was not [John S ***'s] intention to appear evasive, but that it was possibly just "an artifact of his interpersonal skills and his handling of the situation." *Id.* In his April 2000 deposition when asked whether he had told Mr. Brubaker "something illegal was afoot," Mr. Barlow replied, "Certainly not. Not at that point, that's for sure." Trial Tr. 402 (quoting April 2000 deposition.).

Mr. Brubaker's testimony, which falls somewhere between the extremes of Mr. Barlow's characterization, we find to be more reliable:

> Q. Essentially what he told you, and correct me if I am wrong, is that he had information that certain government officials had misled Congress?
>
> A. That's approximately what he said.
>
> Q. Did he come to you as a good American, saying "Boss, here is this major government violation and we need to do something about it."?
>
> A. No.
>
> Q. Can you characterize how he came to you?
>
> A. I think it was more an act of personal—I won't say vengeance, but pursuit of his personal interests of longstanding, and the point of view which he held that somehow the Congress was being misled deliberately by the Executive Branch, which was strictly his—his point of view.[16]

Brubaker 1991 Inter.Tr. 7–8. Mr. Brubaker also testified as follows in a deposition in July 2000:

> Q: So you are not questioning what it says here that you wrote in the memorandum, that Mr. Barlow told you that he learned that Congress had been

---

16. The only evidence to the contrary are the notes taken by Captain Horstman of the DoD in his 1991 interview with Mr. Brubaker. He records Mr. Brubaker as saying that Mr. Barlow had conveyed the impression that "violation of

law had occurred." Mr. Horstman did not testify. When shown this statement, Mr. Brubaker emphatically denied having made it, attributing it perhaps to a misunderstanding at best, or poor recording at worst.

given a misleading and incomplete picture?

A: My recollection is that's exactly what he said, and that's what I wrote in the memorandum.

Q: Did you discuss with Mr. Barlow why he believed that Congress had been given a misleading and incomplete picture?

A: No.

Brubaker July 20, 2000 Depo.Tr. 67.

Despite not having been present at the briefing, and his early statements that he was uncertain what had occurred Mr. Barlow was certain at trial that Mr. S \*\*\* had omitted "some very high percentage [of prepared answers]. I mean don't lock me into 99[%]. 90[%], you know, ..." Trial Tr. 436. This suspicion is flatly contradicted by Mr. Burke and Mr. S \*\*\*.

The court finds it highly unlikely that Mr. Barlow's comments to Mr. Brubaker during this first meeting were as explicit as he now characterizes them. It should be noted too, that as this litigation has advanced and briefing has focused more directly on the elements of a WPA claim, Mr. Barlow's recollection of his statements to Mr. Brubaker have more closely correlated to those elements.

What is undisputed, in any event, is that Mr. Brubaker's reaction to the information was blasé. He gave Mr. Barlow permission to check out the facts with the CIA if he wished and participate in a written CIA follow up.

One of the people Mr. Barlow called was Mr. Burke at the CIA. He confirms that Mr. Barlow contacted him to ask about the briefing, indicating that he had heard that Mr. S \*\*\* was being evasive. Mr. Burke told him that this was not the case; that Mr. S \*\*\* had been accurate. According to Mr. Burke, Mr. Barlow was not satisfied with this explanation, however. During trial, Mr. Barlow testified that Mr. Burke was someone he respected and who he thought was honest. Nevertheless, he deemed Mr. Burke's innocent explanation for what happened to be implausible.

Mr. Barlow also contacted Marvin C \*\*\*, a senior analyst and one of Mr. Burke's subordinates. Mr. Barlow learned that Mr. C \*\*\* was preparing a response to the supplemental questions raised by the committee and offered to assist in preparing the response. Mr. Barlow characterizes Mr. C \*\*\*'s view of things as being more sympathetic to his own, namely, that Mr. S \*\*\* was lying: "he thought John was being dishonest with the committee," according to Mr. Barlow. Trial Tr. 238. Mr. C \*\*\* testified during trial, however, and presented a different view. He was admittedly somewhat less charitable about Mr. S \*\*\*'s presentation than Mr. Burke, suggesting that the answers were not complete. But he conceded that Mr. S \*\*\* was probably as accurate as he could be under the circumstances. There were reasons he could not be more forthcoming, in an effort to protect sources and methods.

Mr. Barlow and Mr. Brubaker had at least one subsequent conversation about the briefing although it is not clear when it, or these, took place. Mr. Brubaker's memo of August 11 suggests July 19, 1989. Mr. Barlow claims that this was a short discussion, in which he merely stopped by Mr. Brubaker's office to report on his conversations with Messrs. Burke and C \*\*\*. The tenor of the conversation is disputed. Mr. Brubaker memorialized this conversation, or possibly a subsequent conversation, in an August 11, 1989 memo for the record. He stated:

> On or about July 19, 1989 Mr. Barlow said that he had learned of a briefing of Congressmen and staff of the House Committee on Foreign Affairs to be presented by the CIA on nuclear activities. He said State Department officials would also be present and that he had requested to be present also but was refused by the CIA. He said that he subsequently had talked with those State officials present and had learned that Congressman Solarz and Congressional staff had been given a misleading and incomplete picture regarding Pakistan's illicit procurement activities in the U.S. He noted in particular that his former supervisor at the CIA, [ ] had made misstatements.

> He told me that he (Barlow) intended to talk with two staff members to "straighten them out" and identified them as Arch

Roberts and Robert Hathaway. I told him that he was not to talk with them and that he was not authorized to discuss any intelligence information with the Congress. Mr. Barlow argued strenuously that because intelligence information had already been conveyed to the Congress that he too could discuss the information on the Hill and could do so without any authorization. I asked how he knew what information had been given to the Congress. He replied that he had talked with Gary Samore of the State Department (Assistant to Ambassador Richard Kennedy) who had told him what had been discussed.

I again told Mr. Barlow he had no authorization to discuss intelligence information about Pakistan with the Congress and he was not to do so. Mr. Barlow then said that I would have to order him not to talk to Congressional staff to prevent him from doing it. I said he was to consider himself so ordered. He reacted cooly by saying, "Let's just pretend this conversation never took place."

As I said in my memorandum of August 3, 1989, I am not confident that Mr. Barlow would not contact these staff members in spite of my clear instructions not to. Information which I have seen on this matter is in [ ] channels, is tightly controlled and subject to ORCON restrictions. Conveying such information without authorization would also violate DoD instructions.

It is clear that during this subsequent conversation Mr. Barlow announced that he would discuss potentially classified information with House staffers, and that it took a direct order from Mr. Brubaker to prevent him from doing so.

Roughly a week later, Mr. Barlow received a copy of the pre-briefing "talking points" prepared for Mr. S ***. Mr. Barlow drew the conclusion that Mr. S *** had not disclosed to the subcommittee everything on the document based on what Mr. Schwartz had re-

layed to the NEVWG. He also determined that there was other information that Mr. S *** did not have access to that should be furnished to the subcommittee.

Mr. Barlow then called Mr. S *** who told him he thought the responses were accurate. Mr. Barlow was not satisfied. He subsequently received a draft of supplemental answers for the subcommittee prepared by the CIA. He made substantive additions and edits to the paper which he showed to Mr. Brubaker on August 3, who approved them. The supplemental answers were subsequently sent to the CIA, and, in some form, eventually reached the subcommittee.[17]

In late July, Mr. Brubaker engaged in extensive discussions with Mr. Rostow about his plans to terminate Mr. Barlow. Although it is not precisely clear when, at some point contemporaneous with these events, Mr. Brubaker also called someone in employee relations at the DoD to discuss Mr. Barlow's termination. Ms. Carol Yeary, an Employee Relations Specialist of Washington Headquarters Service, an agency with personnel functions for the Office of the Secretary of Defense, stated that the first time Mr. Brubaker contacted her regarding the procedures to terminate Mr. Barlow was shortly before a letter of termination was actually given to Mr. Barlow on August 4, 1989.

On July 25, Mr. Brubaker contacted the Defense Intelligence Agency/National Foreign Intelligence Board Office (NFIB) document room to inquire into whether Mr. Barlow had been reading the new information that came into NFIB. This was the first time Mr. Brubaker looked into Mr. Barlow's review of NFIB documents. He was informed that Mr. Barlow had not reviewed certain information. Mr. Brubaker stated during the 1991 DoD Inspector General investigation that "the last straw" was learning that Mr. Barlow had not been reading the NFIB documents. 1991 Interview Tr. 28.

---

17. This document was withheld on states secrets grounds. Mr. Barlow speculates that not all his comments were included. Mr. Brubaker expressed no concern, however, that Mr. Barlow was preparing classified information to be provided to Rep. Solarz and was not upset when Mr.

Barlow went through the appropriate classified channels to correct any misstatement made by the CIA agent before the congressional subcommittee. Mr. Barlow also felt the liberty of delivering his comments to Canton Stoiber, the State Department chair of the NEVWG.

On or about August 1, Mr. Brubaker provided Mr. Mervyn Hampton, the Assistant for Administration at the Office of the Secretary of Defense, a draft of the memorandum he planned to give to Mr. Barlow to inform him of his termination. After Mr. Hampton reviewed the memorandum, he made a notation that he "thought there was no reason not to provide Barlow [with] more details as to reason for termination.... Rostow said he revised draft slightly." Joint Ex. 4. The draft provided, in pertinent part:

> You are hereby advised that your employment will be terminated effective August 26, 1989. The action is being taken because you have failed, during your probationary period, to demonstrate your fitness for employment. Specifically, you have failed, adequately, to perform the principal duties described in your Position Description with respect to assistance to OSD action officers to provide intelligence support for the nuclear and missile nonproliferation activities of the Directorate. During your tenure, you have failed to avail yourself of relevant intelligence reporting available on these topics and to maintain current knowledge of intelligence activities of interest. Your unsatisfactory performance includes multiple instances of failure to complete assignments, draft letters and written analyses requested of you.

The draft, in other words, made no mention of Mr. Brubaker's concern that Mr. Barlow would discuss classified information with Hill staffers.

On August 2, 1989, Mr. Barlow reviewed testimony prepared by Mr. MacMurray, DoD country director for Pakistan, for use by Undersecretary of Defense, Arthur Hughes. Mr. Hughes, with the aid of the prepared testimony, would address Congressional concerns about a proposed sale of F–16 fighter planes to Pakistan. The prepared testimony stated that the F–16s were not capable of delivering nuclear devices without substantial release of technical data from the United States. On August 2, 1989, Mr. Hughes testified to the committee that "past and continued support for Pakistan's conventional defenses reduces the likelihood that Pakistan will feel compelled to cross the nuclear

threshold." *The Proposed Sale of F–16's to Pakistan: Hearing Before the Comm. on Foreign Affairs*, 101st Cong. 8 (1989). Mr. Barlow believed this was false, and on August 2 or 3, told Mr. Brubaker, Mr. Rostow, and the individual who had prepared the testimony, Mr. MacMurray, his concerns about the truthfulness of the Hughes testimony. Mr. Barlow's concerns with respect to Undersecretary Hughes' testimony was later the subject of a DoD investigation.

On August 3, 1989, the same day that Mr. Barlow provided Mr. Brubaker and Mr. Stoiber with his contribution to the supplementation, Mr. Brubaker drafted a memorandum "to provide a record of the reasons" for Mr. Barlow's termination. The memorandum was prepared after discussions that Mr. Brubaker had with Mr. Rostow in late July. The memorandum provided, in pertinent part:

> [Mr. Barlow's] sole interest is Pakistan's nuclear program, which for him appears to be a near obsession. He pursues matters related to Pakistan to the exclusion of nearly all other matters and to the detriment of his other responsibilities.
>
> ....
>
> ... In several instances both then-Director Oplinger and I had to step in and complete letters to other agencies for export licenses of nuclear materials because he had stopped working on them.... He has consistently behaved irresponsibly regarding the preparation of written documents. In February 1989, we were informed by State that Mr. Barlow was more than two weeks delinquent in drafting his portion of a reporting cable on the February IAEA Board meeting, to which he was sent as a DoD representative. After several reminders, Mr. Oplinger had to order him to complete it.
>
> There have been many additional instances of failing or refusing to document and put in writing the results of assignments made by me.
>
> Another significant failure is his refusal to provide even a small amount of intelligence support to any of our staff.... A review of DIA records by me on July 25 indicated that Mr. Barlow has read none of the reports ***, except Pakistan, and he

has read none of those for nearly two months.

. . . .

Mr. Barlow has failed to comply with direct requests to support me as the DoD representative to the SNEC. . . . In sum, Mr. Barlow has failed entirely to acquire or maintain even a fundamental knowledge of current intelligence reporting on countries of nuclear and missile proliferation concern and to support the Directorate in any significant way.

*Finally, I have major concerns about his reliability and judgement as an OSD employee regarding sensitive national security issues of great importance to DoD. On July 19, Mr. Barlow told me he intended to meet and talk to two House Foreign Affairs Committee staff members concerning an Administration briefing on the Pakistan nuclear program given the previous week. He said he had learned that CIA and State representatives had created a misleading picture of Pakistan's activities . . . .*

. . . .

Mr. Barlow seems obsessed with the Pakistan nuclear issue. His lack of judgment, and apparent intention to take things into his own hands reflects an irresponsible and unacceptable attitude by an employee in a position requiring special trust and confidence. Because of this I believe his continued employment could be highly detrimental to the interests of the Department.

(emphasis supplied). Mr. Brubaker marked the *italicized* portion "secret." Although the July 19, 1989 conversation is referred to in the memorandum, Mr. Brubaker stated in his deposition that when Mr. Barlow spoke to him on that date, he did not consider Mr. Barlow a security risk and thus did not contact the security division.

Mr. Brubaker forwarded the August 3 termination memorandum to Mr. Hinds, Mr. Barlow's third-line supervisor and noted that Mr. Rostow concurred with his plans for terminating Mr. Barlow. Mr. Hinds wrote back to Mr. Brubaker the same day and stated: "I have nothing against Rich Barlow,

but I am convinced it is not in the office's interest to let this go on." Joint Ex. 5.

On August 4, 1989, Mr. Brubaker prepared the final draft of the termination memorandum. He gave Mr. Barlow the memorandum the same day. It omitted the reference to Mr. Barlow's threat to speak to Hill staffers. In pertinent part, it stated:

The action is being taken because you have failed, during your probationary period, to demonstrate your fitness for continued employment in your present position. Specifically, you have not performed in satisfactory levels the principal duties described in your Position Description with respect to providing intelligence support to OSD action officers for the nuclear and missile non-proliferation activities of the Directorate. During your tenure, you have neglected to avail yourself of relevant intelligence reporting available on those topics and to maintain a current knowledge of intelligence activities of interest. Your unsatisfactory performance includes multiple instances of failure to complete assignments, draft letters and written analyses specifically requested of you.

On August 4, Mr. Rostow and Mr. Brubaker also informed Mr. Barlow that he was required to report to the Defense Intelligence Agency to be "read out" of his access to *** intelligence concerning Pakistan. On August 8, Leon Kniaz, the Director of Personnel and Security for the Washington Headquarters Service, informed Mr. Barlow that his Top Secret security clearance and access *** were being suspended because of "credible information concerning your ability to safeguard and protect classified information. . . ." Pl.Ex. 17. The Washington Headquarters Service relied on the following information to suspend Mr. Barlow's security clearance:

- Mr. Brubaker's August 3, 1989 memorandum for the record.
- A telephone call from James Ervin of the Defense Intelligence Agency Office of Security to Stephen O'Toole, a personnel security specialist in the Security Division of the Washington Headquarters Service, informing Mr. O'Toole that Mr. Barlow had read a

substantial amount of classified material at the NFIB office after learning that he was being terminated.

Mr. Brubaker testified during the 1993 DoD Inspector General investigation that he did not initiate the suspension of Mr. Barlow's security clearance and the evidence offered at trial did not draw this assertion into doubt.

On August 11, 1989, Mr. Brubaker wrote the memorandum quoted above at page 22 in which he records his discussion with Mr. Barlow about the July 12, 1989 congressional briefing. Mr. Brubaker recorded that Barlow intended to talk with two staff members after the July 12, 1989 briefing to "straighten them out," and that he had instructed Barlow not to do so.

On August 26, 1989, the date Mr. Barlow's termination was to become effective, he resigned from his position, although not from DoD. Mr. Brubaker contacted Michael Maloof in the Defense Technology Security Agency (DTSA). Both Mr. Brubaker and Mr. Maloof believed that work in "enforcement" would suit Mr. Barlow better than work in policy. Unfortunately, Mr. Maloof's boss was Bill Rudman, formerly of the Customs Agency. He was familiar with the circumstances of Mr. Barlow's departure from Customs, and was not interested in helping Mr. Barlow. Mr. Kniaz, Director of Personnel and Security for the Washington Headquarters Service of DoD, also attempted to assist in finding employment for Mr. Barlow elsewhere in DoD. He was unsuccessful in obtaining Mr. Barlow an equivalent job. Instead Mr. Barlow was offered, and he accepted, a series of temporary assignments within DoD. In January 1990, Mr. Barlow went on leave without pay until February 27, 1992, when he resigned from the DoD to take a job as a consultant.

Mr. Barlow complained of what he viewed as improper treatment, with the result that separate investigations were initiated by DoD, CIA, and State Department. A criminal investigation was also launched by the Defense Criminal Investigative Service. In 1993, DoD, CIA, and State Department participated in a joint investigation into the circumstances of his termination. That joint report was then the subject of a General Accounting Office review. These investigations and their findings are explained more thoroughly in *Barlow I* and are summarized briefly in the accompanying appendix to this opinion.

## DISCUSSION

As mentioned above, the court granted summary judgment in favor of defendant in *Barlow I* with regard to plaintiff's claims based on suspension of plaintiff's security clearances, intentional infliction of emotional distress, and blacklisting. Although those issues were not the direct subject of trial, in view of the fact that this is a Congressional Reference, the court was sensitive to whether any of the testimony elicited during trial would lend credence to those claims. It did not. In fact, the contrary was true. Left for trial were plaintiff's WPA and wrongful termination claims.

The WPA declares that an employee who has authority to take any personnel action shall not:

> (8) take or fail to take, ... a personnel action with respect to any employee ... because of—
>
> > (A) any disclosure of information by an employee ... which the employee ... reasonably believes evidences—
> >
> > > (i) a violation of any law, rule, or regulation, or
> > >
> > > (ii) gross mismanagement, a gross waste or funds, an abuse of authority, or a substantial and specific danger to public health or safety,
>
> if such disclosure is not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs ...

5 U.S.C. § 2302(b)(8) (2000). The employee with authority to take a personnel action here is Mr. Brubaker.

The WPA specifies the type of evidence that will support a prima facie case:

The employee may demonstrate that the disclosure was a contributing factor in the personnel action through circumstantial evidence, such as evidence that—

(A) the official taking the personnel action knew of the disclosure; and

(B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action.

5 U.S.C. § 1221(e)(1).

■ The Federal Circuit has summarized the elements as follows: (1) the relevant official has the authority to take, recommend or approve any personnel action; (2) the employee made a protected disclosure; (3) the acting official used his or her authority to take an adverse personnel action against the aggrieved employee; and (4) the official took the action because of a protected disclosure. *Lachance v. White*, 174 F.3d 1378, 1380 (Fed. Cir.1999).

The need for a causal link between the disclosure and the adverse action affords the agency with a defense. It can argue that it would have taken the personnel action irrespective of the disclosure. In addition, defendant here argues that Mr. Barlow was not only wrong about his beliefs of unlawful conduct, but he was unreasonable in his beliefs. Finally, to the extent Mr. Brubaker proposed termination based on his concern that Mr. Barlow would convey classified information to Hill staffers, defendant points to the exclusion form the WPA protection of disclosures "prohibited by law and ... required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs."

■ Federal law with respect to wrongful termination has been codified, in relevant part, through the WPA.[18] Evaluation of the equities in a Congressional Reference is not limited to federal law, however. In the alternative, Mr. Barlow contends that the circumstances here meet the proof required for common law wrongful termination (also referred to as retaliatory discharge). The following are typical elements of such a claim:

an employee must establish that she has been discharged; second, she must demonstrate that her discharge was in retaliation for her activities; and finally, she must show that the discharge violates a clear mandate of public policy.

*Belline v. K–Mart Corp.*, 940 F.2d 184, 186 (7th Cir.1991).

Plaintiff's counsel stated during closing argument that "I think Common Law Retaliatory Discharge is subsumed within the WPA. It's much broader, and the elements of the WPA are more rigorous." Trial Tr. 1161. It is certainly true that, if a termination constituted a violation of the WPA, it would also satisfy these elements of wrongful termination. In the context of this action, however, there is no meaningful difference between common law wrongful termination and a WPA claim. The parties did not present evidence or make argument that was unique to the former cause of action. We will proceed, then, on the assumption that plaintiff must prove the general elements of a WPA claim.

■ Mr. Barlow's claim is given plausibility by two facts. The first is timing. Within three weeks of when he claims to have made a protected disclosure, his July 13 and 19 conversations, Mr. Brubaker, who plainly had authority to act, proposed Mr. Barlow's termination. The second is that one of the reasons Mr. Brubaker listed in his August 3, 1989 memorandum for proposing termination was related to the alleged disclosure:

Finally, I have major concerns about his reliability and judgment as an OSD employee regarding sensitive national security issues of great importance to DoD. On July 19, Mr. Barlow told me he intended to meet and talk to two House Foreign Affairs Committee staff members concerning an Administration briefing on the Pakistan nuclear program given the previous week. He said he had learned that CIA and State representatives had created a misleading

---

**18.** With the possible exception of "blacklisting," a theory addressed in *Barlow I. See* 51 Fed.Cl. at 395.

picture of Pakistan's activities. I told him he was not authorized to discuss intelligence information with them. He argued strenuously that because CIA and State had given them intelligence information, he too could discuss the information on the Hill. He said I would have to order him not to talk to Hill staff to prevent him. I obliged him, however I am not confident he will not contact them in spite of my clear instructions. Providing intelligence information without authorization would be in direct violation of \*\*\* ORCON restrictions and DoD instructions.

As mentioned before, the court finds that there was in fact no violation of law, rule, or regulation in the subcommittee briefing of July 12, 1989.[19] More importantly, however, we find that Mr. Barlow could not reasonably have believed that the subcommittee had been lied to. Consequently his conversations with Mr. Brubaker did not constitute a protected disclosure.

What did Mr. Barlow know as of July 19? He knew from what Mr. Schwartz had told him that Mr. S \*\*\* had answered a question about the number of investigations into Pakistan's efforts to obtain hardware in a way that Mr. Barlow thought was incorrect. He knew that Mr. Schwartz came away from the July 12 briefing with the impression that Representative Solarz accused Mr. S \*\*\* of withholding information. These facts, according to plaintiff, given his extensive background in intelligence concerning Pakistan's nuclear program, as well as his knowledge of Gen. Einsel's prior inaccurate testimony, made his belief that Mr. S \*\*\* had lied to the subcommittee reasonable.

We believe Mr. Barlow's 1989 description of his views of the briefing was more accurate than his current recollections. At that time he did not recall thinking anyone was definitely lying. He wanted to find out the facts: "I had absolutely no knowledge of what took place in the hearing. I did not know what questions were posed to the CIA by the Committee or what answers were provided, just the general subject." Def.Ex. 13. Moreover, whatever suspicions plaintiff may have had on July 13, and they were apparently not grave, they were no longer reasonable on July 19, when he and Mr. Brubaker had their subsequent conversation. In the interim he had contacted people who had attended the briefing—Mr. Burke, Mr. Schwartz, Mr. S \*\*\*, and Mr. C \*\*\*—who did not corroborate Mr. Barlow's suspicions that Mr. S \*\*\* had given false testimony. They told him he was wrong. Some were individuals who Mr. Barlow respected.

In the face of hard evidence, Mr. Barlow simply chose not to accept any innocent characterization of Mr. S \*\*\*'s testimony. The reason is obvious. The facts were immaterial to him because he had one fixed idea—that the administration was trying to cover up Pakistan's nuclear capabilities. In addition, he disliked Mr. S \*\*\*, and he distrusted his former agency. Mr. Barlow could not be objective in processing the data he was receiving.

It should be noted that Mr. S \*\*\* was Mr. Barlow's boss at the CIA. Mr. Barlow continues to believe, incorrectly, that Mr. S \*\*\* attempted to take away his job responsibilities as punishment for contradicting Gen. Einsel. Mr. Barlow felt strongly enough about Mr. S \*\*\* that he tried to have him removed as his supervisor. When Mr. Burke refused to remove Mr. S \*\*\*, Mr. Barlow left the CIA for work at Customs. When he arrived at DoD, the CIA had attempted to block Mr. Barlow's access to documents \*\*\* to DoD's classified document room. And finally, Mr. Barlow had been told by the CIA a few days before that he could not attend

---

19. There are three statutes cited by plaintiff that Mr. Barlow may have believed were violated, the text of these statutes are found in *Barlow I*, 51 Fed.Cl. at 396. The first makes it a crime to make false or misleading statements to Congress. 18 U.S.C. § 1001 (2000). The second statute makes it a crime to obstruct justice by impeding an inquiry by Congress. 18 U.S.C. § 1505. The third statute criminalizes false testimony given under oath before any tribunal competent to administer an oath to tell the truth. 18 U.S.C. § 1621. The fourth statute is specific to the Nuclear Non–Proliferation Act of 1978. It mandated that the DoD, State Department, ACDA, Department of Commerce, Department of Energy, and the Nuclear Regulation Committee keep the Congressional committees on foreign affairs fully and currently informed with respect to their activities to prevent proliferation. 22 U.S.C. § 3282(c) (2000).

the briefing. We believe Mr. Brubaker was accurate when he characterized the tenor of Mr. Barlow's comments about the briefing as a "pursuit of his personal interest." Brubaker 1991 Inter.Tr. 8.

In sum, assuming that Mr. Barlow actually disclosed suspicions of illegal activity to Mr. Brubaker in mid July, those disclosures were not based on a reasonable belief. They were based on a highly subjective view of the facts, and a view that was inconsistent with information he gathered contemporaneously from people he respected. That type of disclosure cannot form the basis of a WPA claim.

Although there were at least two conversations between Mr. Barlow and Mr. Brubaker regarding the July 12 subcommittee briefing, the first conversation is pinpointed by plaintiff as the "protected disclosure." The subsequent conversation, regarding "straightening out" Hill staffers, was not a new disclosure of unlawful activity. What was added was Mr. Barlow's threat to discuss classified material outside of agency protocol.

Even if that subsequent conversation was a "protected disclosure," however, it would not satisfy the elements of the WPA. The second conversation included Mr. Barlow's threat to reveal classified information to Hill staffers. The WPA states that information "specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs" is excluded from WPA protection. 5 U.S.C. § 2302(b)(8). There is no question that Mr. Brubaker was reasonably concerned that Mr. Barlow was threatening a disclosure of secret information that would be in violation of Executive Order No. 12356.[20] Consequently, to the extent that Mr. Brubaker's August 3 memo suggests that an unexpressed basis for disclosure was the potential that Mr. Barlow would contact Hill staffers, this would not be an improper ground for the discharge. Indeed, given the agency's legitimate concerns that procedures be followed in this respect (working through the liaison office and consulting source entities), quite the opposite is true.

■ There is a more basic, and independent reason that Mr. Barlow's claim fails, however. Even assuming Mr. Barlow made a protected disclosure, i.e., that he told Mr. Brubaker he suspected a violation of law and that his beliefs were reasonable, indeed, even assuming that Mr. Brubaker's threat to go to Hill staffers was an additional motive for Mr. Brubaker's actions, we are persuaded that Mr. Barlow would have been discharged whether he made the disclosure or not.

When Mr. Brubaker was made Acting Director of the office, he had already determined that Mr. Barlow would not be extended beyond his probationary period. Well before the July 12, 1989 briefing and the conversations about it, in other words, Mr. Brubaker had unalterable plans to terminate Mr. Barlow. As Mr. Rostow made clear, both he and Mr. Brubaker were aware that Mr. Barlow was roughly a month away from completing his probationary period. Both knew that after that time, Mr. Barlow's position would be significantly more protected. Mr. Brubaker had advocated Mr. Barlow's termination before he even took over as Acting Director. Mr. Rostow testified that he believes that discussions between he and Mr. Brubaker regarding Mr. Barlow's termination began in late July. He did not recall specifically, but raised the possibility that it may have been Mr. Rostow himself or someone from Washington Headquarters Services that originally suggested the termination. He certainly approved it, and Mr. Barlow has in no way suggested that Mr. Rostow was motivated by concern about his "disclosures" threatened or actual.

20. Sec. 4.1 General Restrictions on Access.
(c) Classified information shall not be disseminated outside the executive branch except under conditions that ensure that the information will be given protection equivalent to that afforded within the executive branch.
(d) Except as provided by directives issued by the President through the National Security Council, classified information originating in one agency to which it has been made available without the consent of the originating agency. For purposes of this Section, the Department of Defense shall be considered one agency.
Executive Order No. 12356 (August 1, 1982).

The court believes Mr. Brubaker's statements, maintained consistently throughout this dispute, that he did not propose Mr. Barlow's termination because the plaintiff announced his suspicions about false testimony. In fact, he put no restrictions on Mr. Barlow investigating the facts and permitted him to work with the CIA in providing classified supplemental information. He had no motive to protect the CIA agents who testified before the subcommittee. Instead, the July 19, 1989 conversation was, for him, another example of Mr. Barlow's insubordination and continued "obsession" with Pakistan to the detriment of his other duties. The reasons cited by Mr. Brubaker in his notice of reasons for termination track, almost verbatim, the complaints about Mr. Barlow he had already recorded in April.

This is not to say that Mr. Brubaker discounted Mr. Barlow's threat to "straighten out" some Congressional staffers. As explained above, this threat cannot be the protected disclosure, however. Mr. Brubaker was legitimately concerned that Mr. Barlow not discuss classified information with Congressional staffers. Classified information is subject to severe restrictions, both in terms of access and dissemination. Mr. Barlow had no right to make the threatened disclosure, even if the staffers were cleared. The originating agency maintains control over dissemination. Certainly low level employees cannot nominate themselves to decide whether such restrictions are legitimate.

Thus, even if Mr. Barlow's threat to speak to Hill staffers had been an independent reason for termination, it would not have been improper one. As explained above, DoD had a right to insist on compliance with protocol in dealing with classified materials and could have punished Mr. Barlow for violating procedures. In short, we believe that Mr. Barlow's threat was important to Mr. Brubaker, in that he felt he had to prevent it being acted upon. As far as Mr. Brubaker was concerned, however, he had decided at least three months earlier that Mr. Barlow should go. The coincidence of the July 12 briefing and the end of his probationary period were just that, a coincidence. In that respect, his concern was addressed

without resorting to termination. Mr. Barlow's behavior no doubt confirmed in Mr. Brubaker's mind his earlier decision to terminate Mr. Barlow and for that reason included it in his draft memorandum to Mr. Rostow.

This understanding of events is confirmed by Mr. Rostow. He explained the delicate situation he was placed in as Principle Director of the Office of Negotiations policy. The Office of Non–Proliferation was under consideration for transfer from the Office of the Assistant Secretary for International security to another assistant secretary's office. Once this move was made, Mr. Rostow would no longer have jurisdiction over the Office of Non–Proliferation. Since this transfer was imminent, Mr. Rostow wanted to "get good work out of that office in the near term" and therefore "needed the full cooperation of everybody who worked there." Trial Tr. 826. He testified that the personality conflict between Mr. Barlow and Mr. Brubaker had consumed both men, thereby interfering with the office's productivity. Mr. Rostow believed he was faced with two possible courses of action: "one was to continue to work with Gerry Brubaker and Rich Barlow, and to spend what would have been a great deal of time helping the two of them come to an accommodation and to perform the functions of their office. Or, we could terminate Rich Barlow and let Gerry Brubaker get back to his work . . ." Trial Tr. 841. Mr. Rostow did not believe that removing or transferring Mr. Brubaker was an option because he was a long-term federal employee.

In closing argument plaintiff's counsel pointed to the legislative history of the WPA to support Mr. Barlow's claim: "The WPA was designed to protect 'the Pentagon employee who discloses billions of dollars in cost overruns, and the GSA employee who discloses widespread fraud.'" Trial Tr. 1145–46. Mr. Barlow's claims of "whistle-blowing" are strikingly different, however. Mr. Barlow did not tell his supervisor anything that was not already well known in intelligence circles and in the subcommittee he claims he was trying to inform. The subcommittee knew that there would be follow-up briefing. Everyone who attended the

NEVWG meeting was aware of what was asked and answered at the briefing and that supplementary answers were being prepared. Presumably, the supervisors' of the representatives to the NEVWG meeting knew about the briefing and follow-up. In essence, Mr. Barlow was not bringing to light a scheme to defraud. He was simply relating the news of the NEVWG meeting to his boss, as he would be expected to do as the office NEVWG representative. Mr. Brubaker's actions were not those of someone trying to quiet a whistleblower. Mr. Brubaker consented to Mr. Barlow's plan to call the CIA and ask about the briefing and offer assistance in the drafting of the follow-up. Mr. Brubaker only drew the line when Mr. Barlow suggested that he would disregard security concerns and proper avenues of getting information to Congress and instead speak to staffers directly with regard to information that originated with a different agency.

Finally, with respect to Mr. Barlow's temporary loss of security clearances, Mr. Brubaker testified consistently during his depositions that his concerns about Mr. Barlow breaching security procedures by disclosing information to Hill staffers did not constitute a concern about Mr. Barlow as a security risk. We believe him. The distinction in some respects sounds very fine, but it could not be explored, of course, at trial. Apparently Mr. Brubaker had no real worries that Mr. Barlow was in any sense disloyal. Otherwise he would not have attempted to help him find other employment within DoD. We believe Mr. Brubaker when he states that he did not prompt the security investigation. As a practical matter, however, the fact that Mr. Brubaker mentioned his concerns about Mr. Barlow going to the Hill in his memo justifying termination, along with the annoyance he expressed that Mr. Barlow had tried to suddenly catch up on lost reading time, may have prompted others to accelerate ending his security clearances. Security clearances are inherently matters of grace, however. It is understandable that, with Mr. Barlow about to end his employment, those tasked with controlling access to highly classified materials would have terminated his accesses promptly. They were eventually restored, and agency personnel in the interim did what they could to try to find him employment.

## CONCLUSION

This hearing officer's conclusion is that Mr. Barlow was not a victim of an adverse personnel action in retaliation for expressing concern that Congress had received false testimony regarding Pakistan's nuclear capabilities. The briefing did not violate the law, and Mr. Barlow's belief to the contrary was unreasonable. Mr. Barlow thus did not make a protected disclosure. Even if Mr. Barlow's contrary belief was reasonable, however, and assuming, contrary to evidence, that he informed Mr. Brubaker of a possible violation of law, Mr. Barlow's claim has a more fundamental flaw. Mr. Barlow was a probationary employee who was terminated because of performance deficiencies and personality conflicts that existed before he made any "protected disclosure." Mr. Brubaker would have proposed firing Mr. Barlow, and Mr. Rostow would have approved that termination, irrespective of events following the July 12, 1989 briefing.

Accordingly, this hearing officer recommends that Congress be advised of the following: Any payment to Mr. Barlow under the facts found above would constitute a gratuity. The period for filing notices of acceptance or exception to this report (see RCFC Appendix D, Paragraph 8) will run from the date of filing this redacted report.

## APPENDIX A

*DoD Investigation 1990*

The first investigation involved the DoD IG in fall 1990. Capt. Horstman was in charge of the investigation as Director of Special Inquiries. The agency explored Barlow's allegations that "certain personnel actions taken against him were intended to dissuade him from making protected disclosures to Members of Congress or their staffs, and were, therefore, reprisal for whistleblowing." It also made inquiries regarding Mr. Barlow's allegation that there was "a conspiracy not only within the OASD/ISP/NP–NPP [Office of the Assistant Secretary of De-

fense/International Security Policy/Negotiations Policy–Non–Proliferation Policy], but also the State Department and the Central Intelligence Agency to drive him out of the Government because of the sensitivity of information he possessed." The DoD's conclusion was that "Mr. Barlow was not the victim of reprisal for whistleblowing. The action by the OASD/ISP/NP–NPP to terminate Mr. Barlow during his probationary period was taken because of legitimate management dissatisfaction with his job performance." The investigation found that WPA was not violated because "Mr. Brubaker would have taken the unfavorable action absent the protected disclosure."

### DCIS Investigation 1990

Subsequently, in November 1990 the DoD IG detailed Mr. Barlow to the Defense Criminal Investigative Service (DCIS) "where he was required ... to provide all information known to him concerning criminal activity in the Executive Branch of government." Mr. Barlow alleged that "Central Intelligence Agency, Department of State and DoD employees obstructed criminal investigations and/or justice, lied or mislead a Congressional subcommittee and took retaliatory actions against Barlow." The investigation was coordinated by the Offices of Inspector Generals of the CIA, Department of State, and DoD. Each agency initiated a separate formal investigation. The DCIS investigation concluded that after "[r]eview of transcripts from open and closed sessions of the House Subcommittee on Asian and Pacific Affairs (Solarz Subcommittee) revealed no indications of willful misleading testimony of the DoD [Arthur Hughes] identified by Barlow.... Review of the closed session transcript revealed no DoD testimony was presented."

### CIA Investigation 1991

The DCIS referred Mr. Barlow's allegations of CIA wrongdoing to the CIA IG, Mr. Fred Hitz, in May 1991. The IG investigated Mr. Barlow's allegations that Ret. Gen. Einsel and Mr. S \*\*\* withheld information from, misled, and lied to Congress. The report stated that the investigation "indicated that Mr. Barlow's root complaint reflects

the endemic quarrel between DI analysts, who are responsible for producing and disseminating finished intelligence reports, and [name omitted] who are responsible for protecting the sensitive sources who provide the raw information."

Regarding the Einsel testimony, the report stated that "the testimony to which Mr. Barlow objected appears to have presented in stark, unequivocal terms the Agency's view [ ]. Suggestions by Mr. Barlow and from any other quarter that the Agency misrepresented the status of Pakistan's development of a nuclear weapon in order to influence the certification process appear unwarranted and without foundation. As to withholding sensitive intelligence, a notation attached to the transcript of testimony indicates that one reviewer was concerned that the NIO [Einsel] had revealed too much." The report also stated that "[a]gency officers who testified before the Congress on 12 July did not provide false or misleading statements.... Information was withheld during the hearing only pending authorization to provide it and only in accordance with the guidelines governing congressional testimony by Agency officers." The CIA IG's recommendation states, "[s]ince the investigation failed to substantiate the allegations, found no procedures to be lacking with regard to giving testimony before Congress, and uncovered no significant wrongdoing, no recommendations appear to be necessary."

### State Department Investigation 1991

In May 1991, DCIS also referred the matter to the State Department IG, Sherman Funk. The pertinent allegations were that representatives of the State Department withheld information from Congress and the high-ranking State Department officials tipped-off former Pakistan \*\*\*. The investigation concluded in June 1992 that State Department officials "did not disclose any direct evidence indicating that \*\*\* had been warned as a result of any specific action by either [name omitted] or [name omitted]." With regard to the allegations of withholding information from Congress, the investigation found that "[n]o indication was found that DOS [State Department] officials gave misleading testimony and briefing or intentional-

ly withheld information from Congress on the subject of Pakistan's nuclear program." It did acknowledge that there were "indications of some Congressional disagreement with the DOS position in some areas, but the elements of the issues were known to all involved."

After IG Funk issued the report of his investigation, he wrote a letter to Senator Bingaman enclosing a copy of the State Department's report. IG Funk wrote that "Barlow's life is now a shambles, as a result of his voicing—'within the system'—the views that were perceived by some in high position as unpopular and dangerous to the status quo. This is a sad commentary on how the U.S. Government treats employees with insight, integrity, and courage." This view conflicted with the DoD report regarding Mr. Barlow's proposed termination. In 1992, the Senator encouraged the DoD to reopen the investigation and Capt. Horstman issued a second report but refused to reopen the investigation. In March 1993, the Senator wrote the DoD asking for a reinvestigation. This led to the joint investigation, below.

*Joint IG Investigation 1993*

In 1993 the Offices of IG for the DoD (Derek Vander Shaaf), CIA (Fred Hitz), and State Department (Sherman Funk) began a joint investigation headed up by the DoD. The joint investigation investigated the personnel actions taken while Mr. Barlow was an employee of the DoD. It concluded:

The decision to terminate Mr. Barlow's employment was not based on reprisal or political considerations to stop him from damaging U.S. policy regarding Pakistan. The employment termination of Mr. Barlow for performance deficiencies was supported by the evidence, although factors not cited in the termination notice clearly played a substantial role in that decision. Any concerns we might have raised about the fairness of the termination have been adequately addressed by the remedies granted by the WHS. We note that Mr. Barlow's current personnel record has been expunged of any adverse information relating to a termination, and his access to

classified information was restored by the DoD. We found no basis to recommend further relief in this case.

Before the joint report was released, IG Funk wrote to IG Vander Shaaf on September 17, 1993, to express disagreement with some of the conclusions of the joint report. The joint report was issued without the changes suggested by IG Funk. IG Funk reiterated his concerns to IG Vander Shaaf in November 1993. On December 13, 1993 he withdrew his approval of the joint report and informed Senator Bingaman.

*GAO Review 1997*

In March of 1996, Senators Strom Thurmond and Sam Nunn requested the U.S. General Accounting Office (GAO) review the joint investigation. The GAO's conclusion, issued in July 1997, stated, "We found that the investigative report and files did not fully support the report's conclusions that there was no reprisal and that the proposed termination notice was legally sufficient." A year later Mr. Barlow's private bill for relief was introduced in the Senate.